## UNITED ELECTRICAL, RADIO & MACHINE WORKERS OF AMERICA, CIO, et al., v. BALDWIN et al.

### No. 1798.

District Court, D. Connecticut.
Aug. 2, 1946.

---

David Scribner and Seymour Linfield, both of New York City, and Samuel Gruber, of Stamford, Conn., for plaintiffs.

William S. Gordon, Jr., of Hartford, Conn., for Connecticut Federation of Labor, amicus curiae.

William L. Hadden, Atty. Gen., of Connecticut and Bernard Kosicki, Asst. Atty. Gen., of Connecticut, for defendant State Officials & State Police, named in complaint.

Albert S. Bill, DeLancey Pelgrift and Pelgrift, Blumenfeld & Nair, all of Hartford, Conn., for defendants Officials of Town of West Hartford, and West Hartford Police Officers, named in complaint.

SMITH, District Judge.

Plaintiffs, an international union, a local union, and individual members thereof, on strike over a wage dispute, seek a temporary injunction to restrain acts of the defendants, Connecticut state and municipal officials, claimed to violate the plaintiffs' rights under the federal Constitution, the National Labor Relations Act, 29 U.S.C.A. § 151 et seq., and the Federal Civil Rights Act, 8 U.S.C.A. § 41 et seq. The rights involve home picketing, picketing at the plant entrances, picketing on a public highway adjacent to the plant, distribution of leaf-

lets on another public highway near the main entrance to the plant, parking on the streets in an area near strike headquarters during the day of a scheduled public meeting.

The facts in the case may be outlined briefly as follows: in the course of a controversy over wages, a strike was called, by the plaintiff local union, of the production workers at the machine-tool plant of Pratt & Whitney Division, Niles-Bement-Pond Company, in West Hartford, Connecticut. When the strike had been in progress about two months, during which peaceful picketing had been carried on by members of the union outside the plant gates, the company announced a back-to-work movement for May 13. The union officials thereupon determined to prevent entrance of returning workers to the plant on that day. On May 13, pickets by crowding around the gates, pushing and pulling, hindered entrance to the plant. The West Hartford police, unable to open and hold open by physical strength the way into the gates, called for help from the state police, who came, assisted in opening a way through the pickets, and, together with West Hartford police, made twenty-two arrests for breach of the peace.

The Commissioner of State Police announced that pickets immediately before each gate would be limited to fifteen, in motion. This announcement was understood by police and strikers to be in force and was obeyed until the Commissioner at the time of the trial of this case on June 24 modified it by indicating that thereafter it did not apply but that a limitation of numbers of pickets would be placed by him at any time conditions made it, in his opinion, necessary to preserve order. There has been no further attempt by the union members to block entrance to the plant gates since May 13.

Charter Oak Boulevard, a public street running westerly from Oakwood Avenue some 1484 feet into the plant grounds, in front of the plant office buildings, was closed off at Oakwood Avenue by a fence gate maintained since some time during the war for plant protection. Pickets were not allowed by West Hartford or state police to enter the street beyond the gate for the declared reason of easier protection of workers' cars parked on or near the closed-off street. This restriction was abandoned during the trial.

On May 14, two pickets standing near the curb in the road on Jefferson Avenue, one block from the plant on a bus route to the plant, were ordered to move from there by the Chief of the West Hartford police, who was accompanied by state and West Hartford police. They complied. The purpose of the pickets was to pass out literature to passengers alighting from the buses. The declared purpose of the police was to prevent interference with the movement of traffic.

On May 20, the Governor and Commissioner of State Police issued a statement that the picketing of homes was illegal and must be stopped. Thereafter, arrests were made of pickets on the public sidewalks in front of houses of a plant official and of a non-striking worker, in the Town of West Hartford two and one-half miles and one mile from the plant. Both arrests were made by state and West Hartford police acting together. In one case there was a single picket carrying signs announcing the strike. In the other case eight pickets were walking on the sidewalk, some of them carrying signs referring to the house occupant as a "scab" and a "dog". In neither case were there crowds, noise, or disorder. Those arrested were promptly charged with breach of the peace and released on bail. On trial in the Town Court of West Hartford they were, in each instance, found guilty of breach of the peace, fined $250, and sentenced to imprisonment for six months, with execution of the sentence of imprisonment suspended. Appeal has been taken to the Superior Court for Hartford County and each accused released on bail pending appeal.

Following announcement that about five thousand people were expected at a meeting scheduled for May 21 of strikers and others interested, at the strike headquarters across the street from the main gate of the plant, police (early in the morning, of May 21), posted signs prohibiting parking during the day on the streets bounding

the plant which extend about one-half mile each on the north and south sides and a slightly shorter distance each on the east and west sides, and on the streets in all directions within some three blocks of the place of the scheduled meeting.

The interference with plaintiffs' activities in each of these respects is claimed to be a deprivation of civil rights, and also part of a conspiracy to deny civil rights to the plaintiffs.

### 1. Jurisdiction.

The Court has jurisdiction to entertain the action. The rights of free speech and assembly under the First Amendment are privileges of citizens of the United States, guaranteed against state infringement by the Fourteenth Amendment. The rights to due process of law and equal protection of the laws are guaranteed not only to citizens but to any person. Remedy for deprivation of these rights is provided by the Civil Rights Act, Title 8 U.S.C.A. § 43, jurisdiction over the enforcement of which is given the District Courts by Section 24(14) of the Judicial Code, Title 28 U.S.C.A. § 41(14). Snowden v. Hughes, 1944, 321 U.S. 1, 64 S.Ct. 397, 88 L.Ed. 497; Hague v. C. I. O., 3 Cir., 1939, 101 F.2d 774, 790; Douglas v. City of Jeannette, 1943, 319 U.S. 157, 63 S.Ct. 877, 87 L.Ed. 1324; Burt v. City of New York, 2 Cir., 156 F.2d 791.

The individual plaintiffs as citizens of the United States are proper parties. The plaintiff unions, voluntary associations of individuals, are also proper parties to conduct the suit in a representative capacity in the interest of their members. Rule 17(b), Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c; Hague v. C. I. O., supra; International News Service v. Associated Press, 1918, 248 U.S. 215, 39 S.Ct. 68, 63 L.Ed. 211, 2 A.L.R. 293.

A conspiracy to discourage collective bargaining is a deprivation of the rights secured by the Wagner Act, and therefore also a basis of suit under the Civil Rights Act and Section 24(14) of the Judicial Code referred to above. Suit to restrain such a conspiracy also falls within the jurisdiction of the Court under 24(8) of the Judicial Code, as a suit under a law regulating commerce, under the reasoning of American Federation of Labor v. Watson, 66 S.Ct. 761.

### 2. The Propriety of the Intervention of Equity.

The plaintiffs seek an injunction restraining the defendants from interfering directly or indirectly with rights which the plaintiffs claim are secured to them by the Constitution and laws of the United States. The defendants claim that each restriction has resulted from an attempt on their part to enforce the law of Connecticut as they understand it.

The general policy of the federal courts against interfering with a state's enforcement of its own laws is well recognized. American Federation of Labor v. Watson, 66 S.Ct. 761; Chicago v. Fieldcrest Dairies, 1942, 316 U.S. 168, 62 S.Ct. 986, 86 L.Ed. 1355; Watson v. Buck, 1941, 313 U.S. 387, 61 S.Ct. 962, 85 L.Ed. 1416; Beal v. Missouri Pacific R. Corp., 1941, 312 U.S. 45, 61 S.Ct. 418, 85 L.Ed. 577; Railroad Commission v. Pullman Co., 1941, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971; Di Giovanni v. Camden Fire Ins. Association, 1935, 296 U.S. 64, 73, 56 S.Ct. 1, 80 L.Ed. 47; Spielman Motor Co. v. Dodge, 1935, 295 U.S. 89, 55 S.Ct. 678, 79 L.Ed. 1322. And especially are they reluctant to interfere with the enforcement of criminal laws, American Federation of Labor v. Watson, supra; Douglas v. City of Jeannette, 1943, 319 U.S. 157, 63 S.Ct. 877, 87 L.Ed. 1324; Spence v. Cole, 4 Cir., 1943, 137 F.2d 71; Whisler v. City of West Plains, 8 Cir., 1943, 137 F.2d 938;—even in cases where there is a prosecution under an invalid ordinance, Douglas v. City of Jeannette, supra.

Although this court is not asked to enjoin a prosecution, it is asked to interfere with the activities of law enforcement officers, and a similar reluctance to do so seems in order, especially when it is not clear just what the state law is. Cf. Hawks v. Hamill, 1933, 288 U.S. 52, 60, 61, 53 S.Ct. 240, 77 L.Ed. 610. "It is particularly desirable to decline to exercise equity ju-

risdiction when the result is to permit a State court to have an opportunity to determine questions of State law which may prevent the necessity of decision on a constitutional question, Chicago v. Fieldcrest Dairies, 316 U.S. 168, 173, 62 S.Ct. 986, 988, 86 L.Ed. 1355." Burford v. Sun Oil Co., 1943, 319 U.S. 315, 333 n. 29, 63 S.Ct. 1098, 1107, 87 L.Ed. 1424. Obviously this rule has no application to a situation where there is no opportunity to litigate the matter in a state court.

■ Federal courts will intervene, however, where there is a restriction in the nature of a previous restraint which may work irreparable damage. Hague v. C. I. O., 1939, 307 U.S. 496, 59 S.Ct. 954, 83 L. Ed. 1423. But there must be "great and immediate" danger of irreparable injury. Douglas v. City of Jeannette, Di Giovanni v. Camden Fire Ins. Association. Spielman Motor Co. v. Dodge, Beal v. Missouri Pacific, supra, which would result from invasion of a right which is clearly protected by the Constitution or laws of the United States. Mayo v. Lakeland Highlands Canning Co., 1940, 309 U.S. 310, 318, 60 S.Ct. 517, 84 L.Ed. 774.

To determine whether equitable intervention is proper, therefore, it is necessary to ascertain whether any of the activities of the defendants constitute a previous restraint upon any right clearly protected by the Constitution or by federal law, and whether there is a great and immediate danger of irreparable injury resulting from leaving the matter to be litigated by the state courts.

### a. Limitation of the number of pickets.

The plaintiffs seek to have this court enjoin the defendants from "interfering" with the peaceful picketing of the premises of their employer, claiming that the limitations imposed by the police restricted their exercise of an activity protected by the Constitution and laws of the United States without first giving them their "day in court". It is not denied that the police have a right and duty to make arrests for breach of the peace and to take measures to preserve the peace. Nor is it denied that there were a number of instances of violence resulting from the presence of solid

lines of pickets before the plant, blocking entrances which the police attempted to keep open. The questions presented by this situation are whether the police may arbitrarily and without any hearing or opportunity for argument by union members limit the number of pickets at the gate of a plant in order to prevent breach of the peace and to permit free access to the plant to those desiring to enter, and whether so-called "mass picketing" is itself protected by the Constitution of the United States so that it may not in any way be limited by state officials.

■ Ever since the decisions in Thornhill v. Alabama, 1940, 310 U.S. 88, 60 S. Ct. 736, 84 L.Ed. 1093, and Carlson v. California, 1940, 310 U.S. 106, 60 S.Ct. 746, 84 L.Ed. 1104, picketing has been described as an exercise of the right to free speech within the ambit of Constitutional protection. Like the right to free speech, which does not include the right to cry "fire" in a crowded theatre (Shenck v. United States, 1919, 249 U.S. 47, 52, 39 S.Ct. 247, 63 L.Ed. 470), the right to picket is not absolute but may be limited in order to preserve the peace and safety of the community. Milk Wagon Drivers' Union v. Meadowmoor Dairies, 1941, 312 U.S. 287, 61 S.Ct. 552, 85 L.Ed. 836, 132 A.L.R. 1200; Thornhill v. Alabama, supra at page 105 of 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093.

■ Whether or not this characterization of picketing as free speech is legally appropriate (See Teller "Picketing and Free Speech" (1943) 56 Harv.L.R. 180) it is apparent that it is not factually appropriate to a situation such as this. Realistically, it cannot be said that a solid line of pickets cutting off access to the premises of an employer is an example of the exercise of the right to free speech: the voice that speaks to the non-striking employee is heard in the language of force rather than in the dialectics of peaceful persuasion. To be sure, some of the pickets in the line may carry signs and the presence of a large number of strikers may publish to the world the fact that the strikers' cause has the impressive sanction of numbers, but both of these functions may be performed without the use

of a solid line which interferes with free access to the picketed plant. At the point where such a line is established, the activity has, to say the least, gone beyond the exercise of free speech in its usual constitutional sense. The constitutional sanction has not, as yet, been extended so far.

The claim is also made that the limitation interfered with the constitutional right of "freedom of association". I do not think that this point can be seriously pressed. The number of pickets was limited at the gates only; the strikers were free to "associate" in other areas within the vicinity of the plant where they would not interfere with travel; in fact, there was a spacious meeting ground across the street which the union officials themselves felt could accommodate five thousand people.[1] Moreover, the right to "freedom of association" has never included the right to associate in large numbers in the middle of a thoroughfare, thus blocking all traffic.

The only other claim of constitutional protection of mass picketing is that an interference with it contravenes the policy of the National Labor Relations Act. This contention was considered and rejected by the Supreme Court in Allen-Bradley Local v. Board, 1942, 315 U.S. 740, 62 S.Ct. 820, 86 L.Ed. 1154, in which the court said (315 U.S. 750, 62 S.Ct. 826, 86 L. Ed. 1154) —"And we fail to see how the inability to utilize mass picketing, threats, violence, and the other devices which were here employed impairs, dilutes, qualifies or in any respect subtracts from any of the rights guaranteed and protected by the federal Act. Nor is the freedom to engage in such conduct shown to be so essential or intimately related to a realization of the guarantees of the federal Act that its denial is an impairment of the federal policy."

It does not appear that any federal right to utilize a solid line of pickets blocking entrance to the plant exists. Whether such an activity constitutes a breach of the peace under Connecticut law, it is not incumbent upon this court to decide. It does appear that there is a constitutional right to picket peacefully and free from interference by arbitrarily placing a "previous restraint" upon this activity. The question remains whether the police have so acted in limiting the number of pickets at the gates.

If peaceful picketing comes under federal protection as long as it does not physically interfere with access to the picketed premises, the question becomes one of drawing the line. It is charged that the police have done that here without giving the union members a chance to be heard. But the federal protection ceases at the point where force begins. And the right of officials of the state to prevent breaches of the peace cannot be denied. Thornhill v. Alabama, supra 310 U.S., at 105, 60 S.Ct. 736, 84 L.Ed. 1093. It is an obvious fact that arrests for such violation of law often prove inadequate to cope with situations involving large numbers of people. In such situations we are all familiar with the fact that the police often lay down rules which temporarily interfere with one or another basic right. To deny them the power to do so would be as much a burdensome restraint on their duty to preserve the peace, cf. Conn. G. S. (Rev.1930) Sections 224, 2292, 2295, as a previous restraint on the right to picket would be upon the activities of strikers.

I do not need to point out that when such a limitation upon the activities of strikers goes far enough to interfere with picketing within constitutional protection, it must be reasonable and necessary to maintain the peace in the particular circumstances at the particular time. A blanket limitation by police or executive fiat without opportunity for the strikers to be heard would be of questionable validity under the Constitution. A temporary order, reasonable, necessary, and limited strictly to the time and circumstances which make it necessary, does not offend under the Constitution.

It is to be noted that the limitation placed upon the number of pickets at the gates in this case, apparently necessary at the time,[2] was retained until date of trial al-

---

[1] See Finding 23.

[2] See Finding 16.

though there was no further apparent threat of disorder.[3] Such a retention of the order raises considerable doubt as to its necessity and therefore as to its validity. It was removed at time of trial, however, and no limitation now exists. No injunction will issue, therefore, against necessary limitation by the police of the number of pickets at each gate.

### b. The ban on home picketing.

The same basic question is raised by the directive of the Governor with regard to home picketing [4]—whether the protection of picketing extends to this type of activity. It is to be noted that the picketing took place on the sidewalks in front of the homes—the pickets did not otherwise go upon the property of the home owners. It was in every sense of the word peaceful, and there was no use of force or threats, although the wife of one man, who was in a highly nervous condition, did leave the house with her husband while the picketing was going on. There was no attempt to block free ingress and egress from the homes, and no violence of any kind. In short, there was no coercion save that which is of the essence of picketing itself and which results from the publicizing of a man's position in a labor dispute.

As indicated above, it is now established that peaceful picketing comes within the scope of the constitutional protection of free speech. Thornhill v. Alabama, 1940, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093. Carlson v. California, 1940, 310 U.S. 106, 60 S.Ct. 746, 84 L.Ed. 1104. Bakery Drivers' Local v. Wohl, 1942, 315 U.S. 769, 775, 62 S.Ct. 816, 86 L.Ed. 1178. Thomas v. Collins, 1945, 323 U.S. 516, 65 S.Ct. 315, 89 L.Ed. 430. And it has been recognized that the streets are a proper place for the dissemination of information and opinion. Schneider v. State, 1939, 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155. Cantwell v. Connecticut, 1940, 310 U.S. 296, 308, 60 S.Ct. 900, 84 L.Ed. 1213, 128 A.L.R. 1352. Whether the street or sidewalk in front of a man's home is equally proper as a place of picketing in industrial disputes has not been decided.

Unlike mass picketing, however, this activity is essentially dedicated to the dissemination of information, not to the use of force or intimidation. To ban such activity because it is unpleasant to have such publicity at home is to admit the effectiveness of this kind of free expression. Picketing of this type brings home the fact that a man may leave his tools at his work but not his conscience or his relations with his fellow man.

Appeals to conscience or reason by a fellow worker may be more effective away from the plant premises. On the other hand, resentment at being forced to consider arguments at home may create a strong resistance to the arguments offered. The infrequent use of this device in the past, and the resultant lack of federal constitutional decisions regarding it may be due to policy against its use rather than question of its legality.

It is true that several times the Supreme Court has used language indicating that the state has power to limit even peaceful picketing. "The power and the duty of the State to take adequate steps to preserve the peace and to protect the privacy, the lives, and the property of its residents cannot be doubted." Thornhill v. Alabama, supra, at page 105 of 310 U.S. 88, 60 S.Ct. 745, 84 L.Ed. 1093. "A state is not required to tolerate in all places and all circumstances even peaceful picketing by an individual." Bakery Drivers' Local v. Wohl, supra at page 775 of 315 U.S. 769, 62 S.Ct. 819, 86 L.Ed. 178. On the other hand, the right to exercise freedom of speech has been extended to the very doorstep of the home. Martin v. City of Struthers, 1943, 319 U.S. 141, 63 S.Ct. 862, 87 L.Ed. 1313.

This new creature of the courts, the "right to privacy" of the Thornhill case, was conceived apparently by Professors Warren and Brandeis and adopted by the courts after it first saw the light of academic day in an article by them. Warren and Brandeis, "The Right to Privacy", 4 Harv.L.R. 193. Before that year, 1890, no English or American court had ever

---

[3] See Finding 17.

[4] See Finding 28.

based relief expressly upon the invasion of such a right. Prosser on Torts (1941), 1050. Apparently it is not as much a right sui generis as it is "a group of related rights". Id. at 1054. Just what rights the Supreme Court referred to in the Thornhill case is not clear, but the Martin case dispels the concept of a sphere of holy inviolability insulating the home from the communication of information.

The several state courts which have declared home picketing illegal or sustained injunctions against it, while deploring the invasion of the peace and tranquility of the home, have not based their holdings upon it, (the right to privacy), with the possible exception of the Minnesota Supreme Court. State v. Cooper, 1939, 205 Minn. 333, 285 N.W. 903, 122 A.L.R. 727. State v. Perry, 1936, 196 Minn. 481, 265 N.W. 302. Most of the cases have based their holdings on a disorderly conduct statute or ordinance, e.g. State v. Zanker, 1930, 179 Minn. 355, 229 N.W. 311, upon the likelihood of resulting violence, Miller v. Gallagher, 1941, 176 Misc. 647, 28 N.Y.S.2d 606, Busch Jewelry Co. v. United Retail Employees Union, 1939, 261 N.Y. 150, 22 N.E.2d 320, 124 A.L.R. 774, Remington Rand v. Crofoot, 1936, 248 App.Div. 356, 289 N.Y.S. 1025, affirmed without opinion 279 N.Y. 635, 18 N.E.2d 37, or upon the basis of intimidation Petrucci v. Hogan, Sup.1941, 27 N.Y.S.2d 718.

Some argument is made by the defendants in this case that the picketing is an incitement to violence. Whether the peaceful picketing of homes is in itself a breach of the peace under the law of Connecticut has not been finally determined. It is hard to see how a single picket quietly patrolling in front of a home is breaking the peace or even instigating any such breach. Nor is he thus intimidating anyone. Certainly it does not appear that there is created thereby a "clear and present danger of destruction of life or property * * * or breach of the peace." Thornhill v. Alabama, 310 U.S. 88, 105, 60 S.Ct. 736, 745, 84 L.Ed. 1093; Bridges v. California, 1941, 314 U.S. 252, 262, 62 S. Ct. 190, 86 L.Ed. 192, 159 A.L.R. 1346. Thomas v. Collins, supra. Cantwell v. Connecticut, supra at page 308 of 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213, 128 A.L.R. 1352. The character of such picketing would vary, of course, with the numbers of pickets, the nature of the matter upon the signs, and the manner of the picketing. The ban is a blanket one,[5] however, against all picketing of homes, and its validity must be considered on the basis of whether the peaceful picketing of a home is protected by the Constitution of the United States.

In view of the foregoing, there is considerable question as to the validity of the ban. As indicated in the discussion above, a federal court will only intervene in the enforcement of state law when the danger of irreparable damage is shown to be both great and immediate. The plaintiffs have failed to make any such showing here. It is of course true that it is almost impossible to demonstrate or even ascertain the effectiveness of home picketing itself, but inasmuch as many thousands of successful strikes have been conducted in this country with extremely infrequent use of home picketing, it is difficult to see how the union will suffer any irreparable damage from the ban—at least until the question can be litigated in the state courts.

■ Since the state law remains somewhat uncertain as to what constitutes a breach of the peace, it appears that this is an excellent case for the application of the principle discussed above of refraining from determining constitutional questions while there is doubt about a question of state law, the answer to which may render the decision of the constitutional question unnecessary.

It is likewise unnecessary for this court to decide whether the Governor had authority to issue the statement or directive and whether the ban contravenes state policy as expressed in its anti-injunction act.

No injunction will issue restraining interference with the picketing of homes.

*c. The ban on picketing on a public highway adjacent to the plant.*

■ The barring of the pickets from entrance to Charter Oak Boulevard ap-

---

[5] See Finding 28.

244

pears to have been clearly illegal. It is important in a case such as this that the plaintiffs be able to carry their message to the other employees, to enlist their sympathy and support. Thornhill v. Alabama, supra at pages 102, 103 of 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093. So long as the picketing is peaceful, the mere inconvenience of administration cannot be considered sufficient grounds for closing off this street.

■ The police cannot choose the place where the plaintiffs are to exercise their constitutional rights by picketing. Schneider v. State, 1939, 308 U.S. 147, 161, 163, 60 S.Ct. 146, 84 L.Ed. 155. Here the street closed off was a perfectly natural and desirable place for dissemination of information regarding the issues of the industrial dispute.

The justice of the plaintiffs' protest against the closing of the street was recognized by the defendants in the course of the trial, and the street reopened. There appears no need for relief on this point, therefore.

*d. The interference with the distribution of leaflets on a public highway near the main entrance to the plant.*

■ The defendants seek to justify ordering two pickets off the street on Jefferson Avenue as necessary in the interests of traffic safety. Again it is a question of whether clearing the traveled part of the street was necessary for the safe movement of traffic. It is highly doubtful whether the conditions justified the order, having in mind the relative importance of the right of free speech and minor inconveniences to traffic. "The privilege of a citizen of the United States to use the streets * * * for communication of views on national questions may be regulated in the interest of all; it is not absolute, but relative, and must be exercised in subordination to the general comfort and convenience, and in consonance with peace and good order; but it must not, in the guise of regulation, be abridged or denied." Hague v. C. I. O., supra at pages 515, 516 of 307 U.S., 59 S.Ct. 964, 83 L.Ed. 1423.

The repetition of such an order is not to be expected except where the danger to traffic is real and immediate. If so confined in the future, no need will exist for the court's intervention.

*e. Restriction on parking in the streets in the area around the scheduled place of meeting.*

■ The area in which parking was prohibited was extensive, but in view of the number of people expected, the court cannot say that the restriction was not reasonably justified by the necessities of handling traffic in the area.

*f. The charge of conspiracy.*

■ A series of erroneous interpretations of law, carrying the threat of continued arrests, might so harass the plaintiffs as to interfere with their constitutional and statutory rights, and cause them irreparable injury. In that case the remedy in the criminal courts would be inadequate and equity would intervene. A conspiracy to reach such a result is alleged here.

The actions of the defendants are claimed to be motivated by defendants' disapproval of the aims and purposes of the plaintiff union, as well as its position in the labor dispute with the company. A finding of such motivation would support the claim of conspiracy to deprive the plaintiffs of their constitutional and statutory rights and would make it so likely that similar acts would be continued that injunctive relief would be called for.

Such a claim has some support in the facts of the illegal restriction on entrance into Charter Oak Boulevard, the doubtful legality of the maintenance of the restriction on the number of pickets before the gates after the immediate necessity therefor ceased to exist, and the ordering of the two pickets away from their position on Jefferson Avenue when it was not clearly shown that a present or imminent obstruction of traffic existed. On the other hand, the general limitation to fifteen of the number of pickets before each gate and the closing of Charter Oak Boulevard have now been abandoned, and the court was impressed with the evident sincerity of the

defendants' expression on the stand of willingness to apply the law as the courts interpret it, to protect equally the rights of all, and to take no sides in the labor dispute.

Of course, the acts of the defendants and the position taken by them on the moot question of home picketing might evidence an active antagonism to the plaintiffs' aims, but it is more likely to be an expression of the perhaps natural preoccupation of those charged with the responsibility of maintaining order in the difficult conditions attending a long-drawn-out and bitter industrial dispute, with the prevention of the beginning of disorder which might grow to proportions difficult to control, overlooking the very real dangers to individual rights lurking in regulation of the place and manner of their exercise.

As has been pointed out, no attempt has been made to limit the number of people alongside the gates on the plant side of the street nor at other places than directly before the gates, nor at all on the opposite side of the street. Except for the incidents of May 13, there has been no violence. With the opening of Charter Oak Boulevard, there is no impediment to the dissemination of information by, or patrolling of, pickets in the plant area and there is no prospect of any except to stop attempts to prevent access to the plant.

On the whole, the court cannot find that the plaintiffs have met the burden of establishing the claimed conspiracy.

### g. Discrimination.

The ban on home picketing is directed not only against the plaintiffs but also any others engaging in like activities. The other restrictions (on number of pickets and parking), so far as they are likely to recur, are directed only to conditions of the moment and would be applied whether the plaintiffs or any others are involved. There is shown here no purposeful discrimination denying the equal protection of the laws and calling for the intervention of the court. Cf. Snowden v. Hughes, 1944, 321 U.S. 1, 64 S.Ct. 397, 88 L.Ed. 497.

### 3. Summary.

The rights of free speech and assemblage are rights fundamental to the maintenance of freedom. They may not be lightly restricted. That thought must be kept uppermost in mind by the police when weighing these rights against some minor inconvenience to traffic or public tranquility. If limitations are out of proportion to the needs of traffic and of maintenance of order, a good defense will exist in the criminal courts to prosecutions for breach of the limitations. If restrictions plainly unfair or illegal are persisted in, making the danger of irreparable injury to the plaintiffs' rights great and immediate, relief may be had in this court. That danger the court can not find in the facts proved on the hearing on the motion for temporary injunction.

For the present the court will retain the bill pending determination by the state courts and on review by the Supreme Court of the United States of the scope and constitutionality of the criminal law of Connecticut defining breach of the peace as applied to home picketing.

The motion for temporary injunction is denied.

### Findings of Fact

1. The individual plaintiffs are citizens of the United States, residents of the State of Connecticut, and members of Local 251, United Electrical, Radio, and Machine Workers of America, CIO, which has been certified as collective bargaining agent for them as production employees of the Pratt & Whitney Division, Niles-Bement-Pond Company at its West Hartford, Connecticut, plant.

2. The defendants are officials of the State of Connecticut and of the Town of West Hartford, Connecticut.

The defendant Baldwin is Governor of the State of Connecticut; the defendant Hickey, Commissioner of State Police in the State of Connecticut; defendants Schatzman, Carroll, Rundle, Matus, Ehlert, and Simon, police officers of the Department of State Police of the State of Connecticut; defendant Loomis, Town Manager of the Town of West Hartford, Connecticut; the defendant Sandstrom,

Chief of Police of the Town of West Hartford, Connecticut; and defendants Hurlburt, Fredin, Keegan, Paulson, and Ziegler, police officers of the police department of the Town of West Hartford, Connecticut.

3. On March 15, 1946, the individual plaintiffs went on strike in an industrial dispute over wages.

4. From March 15, 1946, until May 13, 1946, picketing of the plant was carried on without disorder in the presence of members of the police force of the Town of West Hartford.

5. A few days prior to May 13, 1946, the company announced a back-to-work movement for May 13.

6. On May 11, 1946, at a meeting of the members of Local 251 in Hartford, Albert Fitzgerald, the international president of the United Electrical, Radio, and Machine Workers of America, CIO, told the striking employees to maintain their picket lines to "make sure that not even a mouse goes through those plant gates Monday".

7. On May 13, pickets massed before a number of the gates to the plant and prevented entry of persons attempting to enter both on foot and in cars.

8. The West Hartford police were unable to open and hold open lanes through the pickets to allow entrance to the plant.

9. Thereupon the defendant Sandstrom, Chief of the West Hartford police, called upon the Commissioner of State Police for assistance, sending by messenger a note which had been prepared by him and signed by him and by the Town Manager on May 11 for use in case of such a situation.

10. On May 13, the pickets used abusive language to persons attempting to enter the plant and to the police officers on duty at the gates, threatened some of the persons attempting to enter, and frightened some of these persons by taking hold of cars and rocking them.

11. The pickets were told on May 13 by the loudspeaker system operated from strike headquarters across the street from the main gate of the plant not to let through persons attempting to enter the gates.

12. The state police commissioner and thirty-five to forty state policemen went to West Hartford on May 13 following the receipt of the message from Sandstrom and assisted, against the resistance of strikers and sympathizers, in opening lanes through the crowd at the gates, making twenty-two arrests on charges of breach of the peace.

13. After arrival at the plant gates, the Commissioner of State Police ordered that not more than fifteen pickets be allowed to be in front of any one of the gates and ordered that the pickets before each gate, numbering not more than fifteen, keep in motion.

14. This order was kept in force from May 13 until the date of the trial herein when the definite limitation on numbers of pickets before the gates was terminated by a statement on the witness stand June 24, 1946, by the defendant Hickey, Commissioner of State Police.

15. Picketing of the plant gates has continued since May 13 without further violence or immediate threat of violence with not more than fifteen pickets before any one gate until the statement of the police commissioner at the time of trial, since which time more than fifteen pickets have, at times during the trial, walked in front of some of the individual gates without violence or disorder and without molestation on the part of the police, state or local.

16. The limitation on the number of pickets before each gate to fifteen was not unreasonable as a measure to make possible peaceful entry into the gates of those desiring to do so under the conditions existing on May 13.

17. No conditions have existed since May 13 to the termination of the trial which made reasonably necessary a limitation of the number of pickets before any gate to fifteen.

18. Charter Oak Boulevard is a public street of the Town of West Hartford, Connecticut, running from Oakwood Avenue westerly through the grounds of the plant some 1484 feet to a dead end. It is bounded by Oakwood Avenue on the east and by the office building and grounds of the plant on the other three sides.

19. During the war, for purposes of plant protection, a fence was erected around the grounds of the plant, containing a gate at the easterly end of Charter Oak Boulevard.

20. Pickets have not been permitted by the West Hartford police, prior to May 13 or by the state or West Hartford police from May 13 to the date of the beginning of the trial, to enter upon Charter Oak Boulevard for any purpose. This restriction was not reasonably necessary for the control of traffic or the maintenance of order.

21. Since the beginning of the trial June 24, 1946, pickets have been permitted freely to go through the gate at the entrance to Charter Oak Boulevard, and to picket upon Charter Oak Boulevard.

22. On May 14, 1946, two pickets were standing in the street near the curb, about one block from the plant premises, on Jefferson Avenue for the purpose of distributing literature to bus passengers on buses approaching the plant when they were ordered not to do so at that point by defendant Sandstrom who was accompanied by both West Hartford and state policemen.

23. On May 20, 1946, announcement was made of a scheduled meeting to be held on a parking lot across from the main gate of the plant at which, it was announced, some five thousand persons were expected.

24. On the morning of the day scheduled for the meeting, May 21, between three and five o'clock, notices were posted by the police, on the order of the state police commissioner, and the Chief of the West Hartford police, prohibiting parking during that day on the streets bounding the plant and on the streets for a distance of three blocks north and northeast of the scheduled site of the meeting and for a distance of two long blocks to the south and southwest.

25. Announcement was made on the morning of the meeting that the meeting had been called off by the union because of the parking ban.

26. Between two hundred and three hundred people came to the place of meeting and were addressed by two speakers.

27. It has not been established by the evidence that the area in which parking was prohibited was unreasonably large and not a necessary measure for traffic control in view of the number of people expected to attend the meeting.

28. The defendants Baldwin and Hickey, on May 20, 1946, issued an announcement of policy to the effect that picketing of private homes was considered by them to be illegal and that appropriate action would be taken to stop it. The announcement was as follows: (Plaintiffs' Exhibit A)

"From Executive Chambers

State Capitol
Hartford, Connecticut.

May 20, 1946.

Commissioner Hickey and Governor Baldwin conferred this morning concerning the Niles Bement Pond Strike. After the conference they issued the following public statement:

'It is reliably reported that this morning instructions were given from the Strike Committee Headquarters opposite the Niles-Bement-Pond Company in West Hartford over the public address system asking for ten volunteers who would go and picket a private home.

'The picketing of private homes is unlawful and cannot and will not be tolerated. We intend to take appropriate action to stop it. A decent and proper respect for the security of individual citizens in their own homes must be observed.'"

29. In several cases, arrests were made pursuant to this announcement on a charge of breach of the peace for picketing in front of private homes in West Hartford.

30. The arrests were made by state and West Hartford police acting together.

31. Those arrested were tried, convicted, and sentenced to pay fines in the amount of $250 each and to be imprisoned for six months, with execution of the sentence of imprisonment suspended, by the Town Court of West Hartford, Connecticut.

32. The arrests were made in the case of eight pickets walking upon the sidewalk in front of a private residence at a distance of one mile from the plant, some of the pickets carrying signs containing abusive language such as "Here Lives A Scab" and "A Dog Will Come When Its Master Calls".

Other than the signs, there was no disorder or violence.

33. Arrest was also made and conviction had in case of a single picket walking quietly on the sidewalk in front of a private residence two and one-half miles from the plant with no crowd congregated and with no abusive or otherwise objectionable language upon the signs carried by him, which stated only the fact that the strike was in progress.

34. It is the intention of the defendants to arrest or procure the arrest of any person picketing a home for any purpose connected with a strike arising out of an industrial dispute unless the home is also the place of employment concerned in the industrial dispute.

35. Appeals from the judgment of the Town Court of West Hartford to the Superior Court for Hartford County have been taken in the case of each of the persons convicted of breach of the peace by reason of home picketing.

36. There is no reasonable likelihood of a renewal of the restriction of picketing on Charter Oak Boulevard.

37. There is no reasonable likelihood of a renewal of the blanket limitation of the number of pickets before any gate without regard for the conditions existing at the moment.

38. There is no reasonable likelihood of the continuance of the blanket restriction on picketing on Jefferson Avenue.

39. The defendants intend to, and will continue to, arrest or procure the arrest of persons engaging in home picketing whether peaceful or otherwise.

40. Plaintiffs have failed to establish the existence of an intent on the part of any of the defendants to deny to the plaintiffs the equal protection of the laws or to discriminate against the plaintiffs in the enforcement of the laws. * * *

### Conclusions of Law

1. The court has jurisdiction over the parties and subject matter of the action.

2. Injunctive relief will be granted upon a showing of probability of action by the defendants involving danger of irreparable damage to the plaintiffs, great and immediate.

3. Plaintiffs have the right to picket peacefully upon the public highways in the area of the plant at which a strike is in progress.

4. Regulations on the number of pickets at a given portion of that area or on the manner of picketing may be imposed by the police only when and so long as reasonably necessary to enforce the law.

5. A conspiracy on the part of the defendants to deprive plaintiffs of their right to carry on peaceful picketing in their labor dispute would be sufficient proof of probability of action by the defendants involving danger of irreparable damage to the plaintiffs great and immediate, to require injunctive relief.

6. A purposeful discrimination on the part of the defendants against the plaintiffs in the enforcement of the law would be sufficient proof of probability of action by the defendants involving danger of irreparable damage to the plaintiffs, great and immediate to require injunctive relief.

7. The interpretation of the law of Connecticut prohibiting breach of the peace to include the peaceful picketing of homes is of doubtful validity.

8. This court should not grant injunctive relief against the enforcement of the law of Connecticut prohibiting breach of the peace as including home picketing pending the final determination on its interpretation and constitutionality by the courts of Connecticut and on review, the Supreme Court of the United States.

9. The restriction on the number of pickets under the conditions existing after May 13 and before June 24 was of doubtful validity under the United States Constitution.

10. The ban on picketing on Charter Oak Boulevard from prior to May 13 until June 24 was in derogation of the rights of the plaintiffs.

11. The ordering of two pickets off Jefferson Avenue on May 14 was in derogation of the rights of the plaintiffs.

12. The restrictions on parking on May 21 were not shown to be in derogation of the rights of the plaintiffs.

13. Plaintiffs have failed to establish either conspiracy on the part of the defendants, purposeful discrimination by the defendants against the plaintiffs or the probability of future action by the defendants similar to that referred to in paragraphs 9, 10, and 11 of these Conclusions, sufficient to constitute danger of irreparable damage to the plaintiffs, great and immediate.

14. Plaintiffs are not entitled to a temporary injunction against the defendants.