OPINION OF THE COURT
Anthony J. Cerrato, J.
"Residential picketing is a regrettable tactic in the armament of protestors. Nevertheless, it is a constitutionally colored activity — it partakes of the rights of speech, assembly, and petition. This characterization, plus the absence of precedents which are dispositive, requires a careful analysis of the feasibility of proscription.”[1]
The action here is for a permanent injunction against the repetition, allegedly threatened by defendants, of acts of coercion, intimidation and harassment allegedly committed against plaintiffs on the night of August 4-5, 1977, and for an injunction against all picketing whatsoever at plantiffs’ residence by defendants. Defendants do not oppose injunctive *123 relief with regard to illegal acts (though they believe such injunction is not necessary and deny having committed any illegal acts) but oppose injunctive relief in connection with picketing of plaintiffs’ home especially as limited to the terms of the original restraining order, i.e., a limited number of persons limited in time to the hours between 9:00 a.m. and 8:00 p.m.
BACKGROUND
Plaintiffs, Adam[2] and Jane Walinsky, are residents of Scars-dale, New York. The individually named defendants are members of the defendant Gay Activists Alliance,[3] an association of avowed homosexuals. On June 21, 1977 plaintiff Adam Walinsky authored an article for the opinion page of the New York Daily News opposing the enactment of the so-called "gay-rights” bill then before the City Council of the City of New York. The article, it seems, supported the rights of homosexuals already established under court decision, to nondiscrimination by government, including the right to hold any government job. Mr. Walinsky in his article, insisted, however, that along with a "right of privacy” there is also a "duty of privacy” — and homosexuals should not overtly inflict their beliefs and status upon others, such as their students or fellow employees. Walinsky opined that the bill before the City Council did not clearly recognize the foregoing and that the bill "amounts to a formal declaration that homosexuality is morally or socially equal to heterosexuality” and that this would be wrong.
Apparently in response for writing this article, the Gay Activists Alliance on August 4, 1977 made plans for, and carried out a public demonstration purportedly near the Walinsky residential home. At approximately 11:00 p.m. on August 4, 1977 as the plaintiffs were allegedly preparing for bed some loud firecrackers were exploded near their front door. The plaintiffs claim also to have heard a series of noises as if something were hitting the house.[4] Plaintiff Jane Walinsky went to the window and allegedly observed the "shapes of *124 people, and firecrackers exploding” near the front door.[5] Voices began to shout, "Walinsky, we’re going to get you.” Alarmed by these events, plaintiff Jane Walinsky picked up the telephone to call the police but found that the telephone was dead. It later was discovered that the wires had been cut at about the point where Mr. Walinsky had seen the "shapes of people.”
Plaintiff Adam Walinsky claims to have dressed hurriedly and left the house to encounter what proved to be the vanguard of a contingent of 40 professed homosexuals. Joseph Kennedy, one of the named defendants who later identified himself to the police as the "Political Action Director” of the Gay Activists Alliance, was leading the crowd in a chant, "Walinsky, you liar, we’ll set your house on fire.”[6] The chanting protestors were, at this point in time, marching up and down a public street some 30 feet from the Walinsky home. In addition to chanting their slogans "gay rights now”, "two, four, six, eight, gay is just as good as straight,” they proclaimed loudly "Walinsky is a bigot.” They carried baseball bats, blew whistles and shouted into bull horns. Interspersed between the above chants they would shout threatenting warnings like, "Walinsky, we’re going to get you,” and the like. A few of the Walinsky neighbors came out to investigate the disturbance in their normally tranquil neighborhood and were handed leaflets containing threats directed against the plaintiff Adam Walinsky.[7]
After a while the police arrived on the scene. No arrests were made, in part because the Walinskys did not see any of the criminal acts described being committed, and because — as *125 the police said — they did not wish to "inflame” the situation and "you never know what a crowd like that will do.” Before reboarding the bus on which they had arrived the Gay Activists Alliance made explicit the purpose for which they had come by announcing, "Walinsky won’t be writing any more articles for the Daily News”, and "he knows what will happen to him if he slanders gay people”, and "we’ll be back.”
The plaintiffs have alleged that the acts of the defendants have already inflicted substantial mental and physical damage. Allegedly, plaintiff’s children and plaintiff Jane Walinsky now have unnatural fears of being left alone at night. Plaintiffs assert that all of the foregoing has been done in a concerted effort to deprive plaintiff Adam Walinsky of his fundamental right to voice his opinion on public issues. Mr. Walinsky is not a public official, holds no government posts, and maintains that his right to the privacy of his home and to the expression of his views, must be preserved inviolate against the "thuggery of any political or sexual persuasion.” Plaintiffs urge that the acts of August 4-5 not be allowed to be repeated and note that a repetition is exactly what is threatened by the explicit statments of the defendants themselves.
ISSUE
The main issue posed on this motion is not whether an injunction should issue against any further acts of coercion, intimidation and harassment, for it is clear such an injunction is proper here (Segal v Wood, 42 AD2d 548; West Willow Realty Corp. v Taylor, 23 Misc 2d 867, app dsmd 10 AD2d 1002; Plainview Realty v Board of Managers of Vil. on Artist Lake Condominium, 86 Misc 2d 515; Flamm v Van Nierop, 56 Misc 2d 1059; see, also, People v Levner, 30 NYS2d 487, 493) and indeed not even the defendants seriously oppose such relief — denying as they do the commission of any illegal acts. The real issue is whether an injunction should issue in favor of plaintiffs against any and all picketing whatsoever by defendants at plaintiffs’ residence as is urged. Such a broad injunction involves a balancing of competing social interests and a detailed consideration of the constitutional right of free speech.
OVERVIEW OF CASE
The early history of picketing focused on labor unions and *126 their struggle for the rights of workers. To many, the very word "picketing” was synonymous with labor strife. In recent yeears picketing has been used to advance a number of nonlabor goals — chief among them, civil rights. When, however, picket lines formed outside the private homes of both public officials and private citizens, the question arose as to the constitutional propriety of picketing in residential areas. The advocates of this form of picketing note that it is a form of speech protected by the First and Fourteenth Amendments to the United States Constitution against governmental interference, citing Thornhill v Alabama (310 US 88). Opponents contend that where there are other forms available for exercising free speech the sanctity of the private home should be held inviolate.
DISCUSSION
To be sure, where picketing of private homes occurs, there are definite conflicts of social interests. On the one hand there are rights of the picketers in exercising free speech, and on the other hand the right of privacy — the right to the peaceful enjoyment of one’s home which has found expression in decisional[8] and statutory law.[9]
A. THE PUBLIC FORUM
Supporters of residential picketing specifically predicate their right upon the formidable premise that the streets and parks are owned by the public at large and have from time immemorial been a traditional public forum of the people in their exercise of free speech, citing a line of cases starting with Hague v C. I. O. (307 US 496, 515) and Thornhill v Alabama (supra). From an economic point of view the streets afford the pickets the benefit of minimal costs — a consideration of some importance to those aggrieved, as in many *127 instances they are the persons least able to finance the expression of their complaints.
At the outset it is well to refer to the language of the United States Supreme Court in Cox v Louisiana (379 US 536, 554) wherein the court remarked: "The rights of free speech and assembly, while fundamental in our democratic society, still do not mean that everyone with opinion or beliefs to express may * * * [speak] at any public place and at any time. The constitutional guarantee of liberty implies the existence of an organized society maintaining public order, without which liberty itself would be lost in the excesses of anarchy.” That same court went on to say (p 555): "We emphatically reject the notion urged by appellant that the First and Fourteenth Amendments afford the same kind of freedom to those who would communicate ideas by conduct such as patrolling, marching, and picketing on streets and highways, as these amendments afford to those who communicate ideas by pure speech.”
An important distinction between the Hague case relied on by defendants, and the facts herein presented, is that Hague involved the distribution by picketers in a labor dispute of leaflets on business not residential streets. The foregoing, in addition to the increased emphasis placed on the right of privacy calls into question some of the broad sweeping language of the Hague and Thornhill cases. (See Cox v Louisiana, supra; Teamsters Union v Vogt, Inc., 354 US 284; see generally Gregory, Labor and the Law, ch 11.)
The Supreme Court case of Gregory v Chicago (394 US 111, supra) has been cited and relied on by both plaintiffs and defendants. That case involved peaceful and orderly marching (not picketing) conducted on the streets of Chicago. Moreover, the marchers were seeking to make their grievances know to a public official, the Mayor of Chicago. These are importinant distinguishing features from that at bar. It is significant to note, however, that it was in this case that the late and esteemed Justice Black, a champion of free speech and the First amendment, remarked in his concurring opinion (pp 125-126): "I believe that the homes of men, sometimes the last citadel of the tired, the weary, and the sick, can be protected by government from noisy, marching, tramping, threatening, picketers and demonstrators bent on filling the minds of men, women and children with fears of the unknown.”
This right to keep the family home peaceful and free of *128 unwanted disturbance (the so-called right of privacy) has been referred to by many other Jurists in many other judicial decisions.
Thus, Justice Stanley Reed in the Kovacs[10] case said: "The preferred position of freedom of speech in. a society that cherishes liberty for all does not require * * * [society] to be insensible to claims by citizens to comfort and convenience. To enforce freedom of speech in disregard of the rights of others would be harsh and arbitrary in itself.”
In Breard, [11] the Supreme Court said: "All declare for liberty and proceed to disagree among themselves as to its true meaning. There is equal unanimity that opportunists * * * cannot be permitted to arm themselves with an acceptable principle, such as * * * a free press, and proceed to use it as an iron standard to smooth their path by crushing the living rights of others to privacy and repose.”
Justice William Douglas on more than ne occasion has championed the right of privacy. In Public Utilities Comm, v Pollack he said: "Liberty in the constitutional sense must mean more than freedom from unlawful governmental restraint; it must include privacy as well, if it is to be a repository of freedom. The right to let alone is indeed the beginning of all freedom * * * When we force people to listen to another’s ideas, we give the propagandist a powerful weapon * * * Once privacy is invaded, privacy is gone.”[12]
To the same effect see Griswold v Connecticut (381 US 479, supra).
Perhaps the best refutation of defendants right to residential picketing based on their claim that the public streets have always been used as a public forum is found in Professor Kamin’s well known article on residential picketing wherein he writes: "It may be historically true, as Justice Roberts suggested in Hague v. CIO, that time out of mind streets and public places have been used for purposes of assembly and exchange of thought and opinion. But it is also true that time out of mind the home has been man’s sanctuary, the shelter of his family, the repository of his memories, and the center of his hopes; that time out of mind residential streets and *129 sidewalks have encompassed the light and the air of the community’s residents; that time out of mind in the day children have played and at night lovers have strolled on residential sidewalks. It may be readily agreed that communities like Harlem * * * [Watts] lack many of the amenities sought to be preserved by legal protection of the quiet enjoyment of residential premises. But I cannot agree that because many Americans do not have decent and quiet housing, that those who do should have their quiet and privacy expropriated.”[13]
B. THE COERCIVE EFFECT OF RESIDENTIAL PICKETING
Another consideration advanced in favor of residential picketing is its persuasive import on the person picketed. It has been noted in the afore-mentioned legal article on Picketing The Homes of Public Officials (34 U Chi L Rev 106, 126): "The singularity of the activity, combined with the physical presence of aggrieved citizens and with the mentally distressing consequences of this presence, may serve to impress and even persuade the official more than would newspaper editorials or picketing of his office.”
The defendants also point to the language in United Elec., Radio & Mach. Workers v Baldwin (67 F Supp 235) as further support for their claim that residential picketing is an important tactic in the armament of picketers. There the court said (p 242): "Picketing of this type brings home the fact that a man may leave his tools at his work but not his conscience or his relations with his fellow man.”
In the opinion of this court it is this very coerciveness advanced by the defendants in support of residential picketing which, in part, leads me to grant plaintiffs’ request for the broad all-inclusive injunction sought.
When dealing with residential picketing by social protestors we are not dealing with "pure speech” but invariably involved in confrontation. As Professor Kamin so aptly describes it, confrontation "laden with emotion, full of suggestions of acute economic conflict and even unspoken possibilities of a violent physical encounter.” (61 Nw U L Rev 177, 211.) Such confron *130 tation, as here, at the family home is fraught with danger and threatens the peace and tranquility of the entire neighborhood. It subjects not only one’s family but also his neighbors to the harassment of the picketers. Certainly the foregoing is descriptive of the situation which occurred at the Walinsky home on August 4-5, 1977. Unfortunately, as the picketing becomes more vociferous the pressure to change one’s position to that held by the picketers increases more out of concern for one’s family and neighborhood than because of the strength of the picketers’ arguments. All too often, as in this case, it becomes clear that the defendants seek not so much a forum to express their ideas but rather to force (by mounting social pressure and intimidation) a private citizen to change his views on one of the important issues of the day. As Professor Kamin notes (61 Nw U L Rev 177, 231) in his article heretofore mentioned: "[W]hen a group resorts to residential picketing, it [in many instances] introduces a note of physical intimidation and coercion which is as foreign to our notions of proper public decision-making as bribery, blackmail, or overt physical coercion. If public decisions are to be made in this way, the group which can bring the greatest * * * [pressure] to bear upon officials will see its views prevail. A government somewhere might function this way — but it would not be a democracy.”
The plaintiffs in their memorandum properly point out that Professor Kamin is talking about picketing of the home of a public official. Certainly these views, if anything, are more applicable to the case at bar of a private citizen.[14] The public official, after all, may arguably be said to have surrendered, in part, his right to privacy. (See New York Times Co. v Sullivan, 376 US 254.)
Finally, in a case such as here, where feeling on the underlying issue runs high, Mr. Walinsky may well find that in the event that he capitulates to the pressure of residential picketing by defendants, the next night his house would be besieged by those espousing the viewpoints contrary to the first picketers.
In the opinion of this court, this coercive pressure brought against a private individual near his home cannot, in these circumstances, be sanctioned.
*131 C. ALTERNATIVE SITUS FOR PICKETING
In labor disputes the lawful place for defendants’ picketing operations is at the site of the employment where are located the working conditions to which the strikers object. (Hebrew Home & Hosp. for Chronic Sick v Davis, 38 Misc 2d 173, 177-178; Springfield, Bayside Corp. v Hochman, 44 Misc 2d 882; see, also, People v Kopezak, 153 Misc 187, affd 266 NY 565.) Similarly, where a private citizen with an easily ascertainable New York City office has views published in a New York City paper, he should not be subject to picketing at his Westchester home. Certainly, picketing by defedants at Mr. Walinsky’s law office or at the Daily News offices would provide a greater public forum for defendants than the sprawling suburban community of Scarsdale.
Defendants’ reliance on the case of Food Employees v Logan Plaza (391 US 308), which they use to support their argument that picketing may not be enjoined "just because there may be other places where the communicant may still be able to find people with whom he wants to talk” is misplaced, in light of the express language of the Supreme Court in Hudgens v NLRB (424 US 507), overruling that case.
Here the fact that the defendants sought to picket at plaintiff Adam Walinsky’s home, rather than at alternative sites, is just further evidence of the attempt to force him to change his views rather than to persuade him by force of logic to do so. This court cannot, nor will it, permit this. If subjecting one’s family and neighbors to the harassment of demonstrations and picketing is the price a private citizen must pay for expressing his views then surely we will lose the one pervading thought which our founding fathers have conveyed to us — that of fostering the free and open exchange of ideas. A silent majority is enough. We should not become a country where only the most boisterous voices are heard.
CONCLUSION
After much reflection on this most difficult of cases and having weighed the pros and cons of picketing at the home, I conclude that under the circumstances presented the right of privacy must prevail. While the prohibition of picketing at the Walinsky home would work to the detriment of the picketers by removing a forum which affords them economy and effectiveness, the fact that alternative demonstration sites are *132 available,[15] and the fact that only by prohibition can the homeowner’s interests be protected[16] weighs heavily in my determination.
In conclusion, it is important to remember that we are not dealing with peaceful marching as in the Gregory case or distribution of leaflets as in Organization for a Better Austin v Keefe (402 US 415) but with picketing and all that such term embraces. The plaintiffs do not seek to restrain the defendants from marching through Scarsdale or handing out leaflets to residents in Scarsdale, but only to restrain the defendants from picketing at their home. This court grants plaintiffs’ motion for an injunction prohibitng defendants from any further picketing at their home.

.See Comment, Picketing the Homes of Public Officials (34 U Chi L Rev 106,140).

. Mr. Walinsky was the unsuccessful Democratic Party candidate for New York State Attorney-General in 1970. It is claimed by defendants that Mr. Walinsky sought and/or was supported by defendant organization (GAA) in that campaign.

. Gay Activists Alliance is an organization of militant homosexuals dedicated to the advancement of homosexual interests.

. The Walinsky home was splattered with raw eggs.

. The words “Go Gay” were spray painted in large letters on the driveway.

. The specific language is disputed. The defendants claim that they were chanting, "Walinsky, you liar, we’ll set your ass on fire.” It is questionable whether this latter language, even if true, would render the apparent threat any less menacing.

. The leaflet which was handed out and was not disavowed by defendants proclaimed in part: "Tonight militant gay people have brought this war (perceived conflict by 'gays’ and those who would oppose them) home to Walinsky and have succeeded in making his life miserable * * * Bigots, hatemongers and advocates of prejudice like Walinsky will deeply regret that they ever opened their homophobic mouths * * * Walinsky and other vile enemies of gay people who try to meddle in our lives and tamper with our rights by day will not be permitted to escape the consequences of their evil deeds at night by fleeing from Manhattan to surburban homes with unlisted phone numbers and secret addresses. Wherever they try to hide, the foes of gay liberation will not be safe. We are on the offensive now. We will find them, we will confront them, we will condemn them, and we will defeat and destroy them!”

. Cox v Louisiana (479 US 555); Gregory v Chicago (394 US 111) [concurring opn by Justice Black]); Kovacs v Cooper (336 US 77); Breard v Alexandria (341 US 622); Garcia v Gray (507 F2d 539, 544, cert den 421 US 971); cf. Martin v Struthers (319 US 141) and Griswold v Connecticut (381 US 479); Griswold, The Right To Be Let Alone (55 Nw U L Rev 216).

. At least nine States appear to have enacted statutory prohibitions against residential picketing. (Col Rev Stat, ch 80-4-6 [1963]; Gen Stat Conn, § 31-120 [1958]; Fla Stat, § 447.09, subd [12] [1975]; Rev Laws Hawaii, § 379A-1 [1972]; Gen Stat Kan Ann, § 44-809, subd [13]; Mich Comp Laws, § 423.9f, subd [4]; Rev Stat Nev, § 28-812 [1964]; Utah Code Ann, § 34-1-8 [2] [a] [1963]; Wis Stat, § 111.06 [2] (a) [1963].)

. Kovacs v Cooper (336 US 77, 88, supra.)

. Breard v Alexandria (341 US 622, 625-626, supra.)

. Public Utilities Comm, v Pollak (343 US 451, 467, 469 [dissent of Justice William Douglas].)

. To be sure complexities arise when the same rule as to residential picketing is sought to be applied to a highly urbanized area where living and working are short distances from each other, as opposed to where they are a number of miles apart. (See Kamin, Residential Picketing and the First Amendment, 61 Nw U L Rev 177, 226.)

. Even if picketing at the home of a public official might conceivably be interpreted as related in some way to a right to petition government, the plaintiffs here are private citizens and it is difficult to conceive of how picketing of plaintiffs’ home would bear any relation to the redress of any grievance with the government.

. A more difficult question would be raised if Mr. Walinsky’s office were in his home and there was thus no other suitable forum wherein he could be confronted or the pickets viewpoints could be heard. (See Seim v Tile Layers Union, 301 US 468.) This, however, is not the case at bar.

. The option open to the homeowner and his family to leave their picketed home cannot be considered a reasonable alternative and furthermore, would shatter "the traditional notions of security and privacy associated with the home in our society.” (See Comment, Picketing the Homes of Public Officials, (34 U Chi L Rev 106, 124. See, also, Chafee, Free Speech in the United States, p 407.)