CAREY, STATE'S ATTORNEY OF COOK COUNTY
*v.* BROWN ET AL.

No. 79–703.   Argued April 15, 1980—Decided June 20, 1980

456

BRENNAN, J., delivered the opinion of the Court, in which STEWART, WHITE, MARSHALL, POWELL, and STEVENS, JJ., joined. STEWART, J., filed a concurring opinion, *post,* p. 471. REHNQUIST, J., filed a dissenting opinion, in which BURGER, C. J., and BLACKMUN, J., joined, *post,* p. 472.

*Ellen G. Robinson* argued the cause *pro hac vice* for appellant. With her on the briefs were *Bernard Carey, pro se,* and *Paul P. Biebel, Jr.*

*Edward Burke Arnolds* argued the cause for appellees. With him on the brief was *Michael P. Seng.**

---

*Briefs of *amici curiae* urging reversal were filed by *William W. Becker*

MR. JUSTICE BRENNAN delivered the opinion of the Court.

At issue in this case is the constitutionality under the First and Fourteenth Amendments of a state statute that generally bars picketing of residences or dwellings, but exempts from its prohibition "the peaceful picketing of a place of employment involved in a labor dispute."

I

On September 6, 1977, several of the appellees, all of whom are members of a civil rights organization entitled the Committee Against Racism, participated in a peaceful demonstration on the public sidewalk in front of the home of Michael Bilandic, then Mayor of Chicago, protesting his alleged failure to support the busing of schoolchildren to achieve racial integration. They were arrested and charged with unlawful residential picketing in violation of Ill. Rev. Stat., ch. 38, § 21.1–2 (1977), which provides:

> "It is unlawful to picket before or about the residence or dwelling of any person, except when the residence or dwelling is used as a place of business. However, this Article does not apply to a person peacefully picketing his own residence or dwelling and does not prohibit the peaceful picketing of a place of employment involved in a labor dispute or the place of holding a meeting or assembly on premises commonly used to discuss subjects of general public interest." [1]

for the New England Legal Foundation; and by *Ronald A. Zumbrun, Robert K. Best,* and *Robin L. Rivett* for the Pacific Legal Foundation et al.

*Howard Eglit* and *David Goldberger* filed a brief for the Roger Baldwin Foundation of ACLU, Inc., as *amicus curiae* urging affirmance.

[1] A violation of § 21.1–2 is a "Class B" misdemeanor punishable by a fine of up to $500 and imprisonment for not more than six months. See Ill. Rev. Stat., ch. 38, §§ 21.1–3, 1005–8–3, 1005–9–1 (1977).

At least four other States have enacted antiresidential picketing laws similar in form to this statute. See Ark. Stat. Ann. §§ 41–2966 to 41–2968 (1977); Conn. Gen. Stat. § 31–120 (1979); Haw. Rev. Stat. § 379A–1 (1976); Md. Ann. Code, Art. 27, § 580A (1976). Connecticut's law has

Appellees pleaded guilty to the charge and were sentenced to periods of supervision ranging from six months to a year.

In April 1978, appellees commenced this lawsuit in the United States District Court for the Northern District of Illinois, seeking a declaratory judgment that the Illinois residential picketing statute is unconstitutional on its face and as applied, and an injunction prohibiting defendants—various state, county, and city officials—from enforcing the statute. Appellees did not attempt to attack collaterally their earlier state-court convictions, but requested only prospective relief. Alleging that they wished to renew their picketing in residential neighborhoods but were inhibited from doing so by the threat of criminal prosecution under the residential picketing statute, appellees challenged the Act under the First and Fourteenth Amendments as an overbroad, vague, and, in light of the exception for labor picketing, impermissible content-based restriction on protected expression. The District Court, ruling on cross-motions for summary judgment, denied all relief. *Brown* v. *Scott*, 462 F. Supp. 518 (1978).

The Court of Appeals for the Seventh Circuit reversed. *Brown* v. *Scott*, 602 F. 2d 791 (1979). Discerning "no principled basis" for distinguishing the Illinois statute from a similar picketing prohibition invalidated in *Police Department of Chicago* v. *Mosley*, 408 U. S. 92 (1972), the court concluded that the Act's differential treatment of labor and nonlabor picketing could not be justified either by the important state

---

been construed to permit all picketing in a residential area except for labor picketing that is not conducted at the situs of a labor dispute. *State* v. *Anonymous,* 6 Conn. Cir. 372, 274 A. 2d 897 (App. Div. 1970); *DeGregory* v. *Giesing,* 427 F. Supp. 910 (Conn. 1977) (three-judge court). The Maryland statute was declared unconstitutional by the Maryland Court of Appeals in *State* v. *Schuller,* 280 Md. 305, 372 A. 2d 1076 (1977). See also *People Acting Through Community Effort* v. *Doorley,* 468 F. 2d 1143 (CA1 1972) (invalidating municipal ordinance virtually identical to the Illinois residential picketing statute); but see *Wauwatosa* v. *King,* 49 Wis. 2d 398, 182 N. W. 2d 530 (1971) (upholding validity of similar ordinance).

interest in protecting the peace and privacy of the home or by the special character of a residence that is also used as a "place of employment." Accordingly, the court held that the statute, both on its face and as applied to appellees, violated the Equal Protection Clause of the Fourteenth Amendment.[2] We noted probable jurisdiction. 444 U. S. 1011 (1980). We affirm.

## II

As the Court of Appeals observed, this is not the first instance in which this Court has had occasion to consider the constitutionality of an enactment selectively proscribing peaceful picketing on the basis of the placard's message. *Police Department of Chicago* v. *Mosley, supra,* arose out of a challenge to a Chicago ordinance that prohibited picketing in front of any school other than one "involved in a labor dispute." [3] We held that the ordinance violated the Equal Protection Clause because it impermissibly distinguished between labor picketing and all other peaceful picketing with-

---

[2] Because the Court of Appeals concluded that the labor dispute exception was not severable from the remainder of the statute, it invalidated the enactment in its entirety. Cf. *State* v. *Schuller, supra,* at 318–321, 372 A. 2d, at 1083–1084. The court therefore found it unnecessary to consider the constitutionality under the First Amendment of a statute that prohibited all residential picketing. *Brown* v. *Scott,* 602 F. 2d 791, 795, n. 6 (1979). Because we find the present statute defective on equal protection principles, we likewise do not consider whether a statute barring all residential picketing regardless of its subject matter would violate the First and Fourteenth Amendments.

[3] Chicago Municipal Code, ch. 193–1 (i) (1968), provided:

"A person commits disorderly conduct when he knowingly:

.          .          .          .          .

"(i) Pickets or demonstrates on a public way within 150 feet of any primary or secondary school building while the school is in session and one-half hour before the school is in session and one-half hour after the school session has been concluded, *provided that this subsection does not prohibit the peaceful picketing of any school involved in a labor dispute. . . ."* (Emphasis supplied.)

out any showing that the latter was "clearly more disruptive" than the former. 408 U. S., at 100. Like the Court of Appeals, we find the Illinois residential picketing statute at issue in the present case constitutionally indistinguishable from the ordinance invalidated in *Mosley.*

There can be no doubt that in prohibiting peaceful picketing on the public streets and sidewalks in residential neighborhoods, the Illinois statute regulates expressive conduct that falls within the First Amendment's preserve. See, *e. g., Thornhill* v. *Alabama,* 310 U. S. 88 (1940); *Gregory* v. *Chicago,* 394 U. S. 111, 112 (1969); *Shuttlesworth* v. *Birmingham,* 394 U. S. 147, 152 (1969). "Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Hague* v. *CIO,* 307 U. S. 496, 515 (1939) (opinion of Roberts, J.). " '[S]treets, sidewalks, parks, and other similar public places are so historically associated with the exercise of First Amendment rights that access to them for the purpose of exercising such rights cannot constitutionally be denied broadly and absolutely.' " *Hudgens* v. *NLRB,* 424 U. S. 507, 515 (1976) (quoting *Food Employees* v. *Logan Valley Plaza,* 391 U. S. 308, 315 (1968)).

Nor can it be seriously disputed that in exempting from its general prohibition only the "peaceful picketing of a place of employment involved in a labor dispute," the Illinois statute discriminates between lawful and unlawful conduct based upon the content of the demonstrator's communication.[4]   On

---

[4] The Illinois residential picketing statute apparently has not been construed by the state courts. Throughout this litigation, however, all parties and the courts below have interpreted the statutory exception for "peaceful picketing of a place of employment involved in a labor dispute" as embodying the additional requirement that the subject of the picketing be related to the ongoing labor dispute. *Police Department of Chicago* v.

its face, the Act accords preferential treatment to the expression of views on one particular subject; information about labor disputes may be freely disseminated, but discussion of all other issues is restricted. The permissibility of residential picketing under the Illinois statute is thus dependent solely on the nature of the message being conveyed.[5]

In these critical respects, then, the Illinois statute is identical to the ordinance in *Mosley,* and it suffers from the same constitutional infirmities. When government regulation discriminates among speech-related activities in a public forum, the Equal Protection Clause mandates that the legislation be finely tailored to serve substantial state interests, and the jus-

---

*Mosley,* 408 U. S. 92 (1972), was premised upon an identical construction. See *id.,* at 94, n. 2 (statutory exemption for "the peaceful picketing of any school involved in a labor dispute" applies only to *labor* picketing of a school involved in such a dispute).

[5] The District Court read the labor exception in this statute as creating two separate classifications: one between "places of employment" and all other "residences," and a second between "places of employment involved in a labor dispute" and "places of employment *not* involved in a labor dispute." The court held that the first classification was a permissible content-neutral regulation of the location of picketing. And although recognizing that the second distinction may well be based on the subject matter of the demonstration, see n. 4, *supra,* the court held that appellees lacked standing to challenge it because they were not seeking to picket "a place of employment," and thus would not have benefitted from a determination that the second classification was unconstitutional. *Brown* v. *Scott,* 462 F. Supp. 518, 534–535 (1978).

The Court of Appeals, in reversing the District Court, refused to adopt the lower court's interpretation of the statute. Rather, it read the "place of employment" exception to divide "residences and dwellings" into but two categories—those at which picketing is lawful (*i. e.,* all places of employment involved in labor disputes) and those at which it is unlawful (*i. e.,* all other residences and dwellings). *Brown* v. *Scott,* 602 F. 2d, at 793–794. We accept the construction of the Court of Appeals. Appellees sought to picket at a residence and were denied permission to do so. They clearly have standing to attack the statutory classification on which that denial was premised. Indeed, appellant does not challenge the Court of Appeals' interpretation of the statute, Tr. of Oral Arg. 13, and he concedes that this restriction is content-based, *id.,* at 21.

tifications offered for any distinctions it draws must be carefully scrutinized. *Police Department of Chicago* v. *Mosley,* 408 U. S., at 98–99, 101; see *United States* v. *O'Brien,* 391 U. S. 367, 376–377 (1968); *Williams* v. *Rhodes,* 393 U. S. 23, 30–31 (1968); *Dunn* v. *Blumstein,* 405 U. S. 330, 342–343 (1972); *San Antonio Independent School Dist.* v. *Rodriguez,* 411 U. S. 1, 34, n. 75 (1973). As we explained in *Mosley:* "Chicago may not vindicate its interest in preventing disruption by the wholesale exclusion of picketing on all but one preferred subject. Given what Chicago tolerates from labor picketing, the excesses of some nonlabor picketing may not be controlled by a broad ordinance prohibiting both peaceful and violent picketing. Such excesses 'can be controlled by narrowly drawn statutes,' *Saia* v. *New York,* 334 U. S., at 562, focusing on the abuses and dealing evenhandedly with picketing regardless of subject matter." 408 U. S., at 101–102. Yet here, under the guise of preserving residential privacy, Illinois has flatly prohibited all nonlabor picketing even though it permits labor picketing that is equally likely to intrude on the tranquility of the home.

Moreover, it is the content of the speech that determines whether it is within or without the statute's blunt prohibition.[6] What we said in *Mosley* has equal force in the present case:

"The central problem with Chicago's ordinance is that it describes permissible picketing in terms of its subject matter. Peaceful picketing on the subject of a school's labor-management dispute is permitted, but all other peaceful picketing is prohibited. The operative distinction is the message on a picket sign. . . . Any restriction on expressive activity because of its content would completely undercut the 'profound national commitment to

---

[6] It is, of course, no answer to assert that the Illinois statute does not discriminate on the basis of the speaker's viewpoint, but only on the basis of the subject matter of his message. "The First Amendment's hostility to content-based regulation extends not only to restrictions on particular viewpoints, but also to prohibition of public discussion of an entire topic." *Consolidated Edison Co.* v. *Public Service Comm'n, post,* at 537.

the principle that debate on public issues should be uninhibited, robust, and wide-open.' *New York Times Co.* v. *Sullivan,* [376 U. S. 254], 270.

"Necessarily, then, under the Equal Protection Clause, not to mention the First Amendment itself, government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views. And it may not select which issues are worth discussing or debating in public facilities. There is an 'equality of status in the field of ideas,' and government must afford all points of view an equal opportunity to be heard. Once a forum is opened up to assembly or speaking by some groups, government may not prohibit others from assembling or speaking on the basis of what they intend to say. Selective exclusions from a public forum may not be based on content alone, and may not be justified by reference to content alone." *Id.,* at 95–96 (citations and footnote omitted).[7]

---

[7] *Mosley* was neither the Court's first nor its last pronouncement that the First and Fourteenth Amendments forbid discrimination in the regulation of expression on the basis of the content of that expression. See *Cox* v. *Louisiana,* 379 U. S. 536, 581 (1965) (Black, J., concurring):

"Standing, patrolling, or marching back and forth on streets is conduct, not speech, and as conduct can be regulated or prohibited. But by specifically permitting picketing for the publication of labor union views, Louisiana is attempting to pick and choose among the views it is willing to have discussed on its streets. It thus is trying to prescribe by law what matters of public interest people whom it allows to assemble on its streets may and may not discuss. This seems to me to be censorship in a most odious form, unconstitutional under the First and Fourteenth Amendments. And to deny this appellant and his group use of the streets because of their views against racial discrimination, while allowing other groups to use the streets to voice opinions on other subjects, also amounts, I think, to an invidious discrimination forbidden by the Equal Protection Clause of the Fourteenth Amendment."

See also *Erznoznik* v. *City of Jacksonville,* 422 U. S. 205, 209, 215 (1975); *Hudgens* v. *NLRB,* 424 U. S. 507, 520 (1976); *Madison Joint School*

## III

Appellant nonetheless contends that this case is distinguishable from *Mosley*. He argues that the state interests here are especially compelling and particularly well served by a statute that accords differential treatment to labor and non-labor picketing. We explore in turn each of these interests, and the manner in which they are said to be furthered by this statute.

### A

Appellant explains that whereas the Chicago ordinance sought to prevent disruption of the schools, concededly a "substantial" and "legitimate" governmental concern, see *id.*, at 99, 100, the Illinois statute was enacted to ensure privacy in the home, a right which appellant views as paramount in our constitutional scheme.[8] For this reason, he contends that the same content-based distinctions held invalid in the *Mosley* context may be upheld in the present case.

We find it unnecessary, however, to consider whether the State's interest in residential privacy outranks its interest in quiet schools in the hierarchy of societal values. For even

---

*District No. 8* v. *Wisconsin Employment Relations Comm'n*, 429 U. S. 167, 175–176 (1976); *First National Bank of Boston* v. *Bellotti*, 435 U. S. 765, 784–785 (1978); *Consolidated Edison Co.* v. *Public Service Comm'n, post,* at 536–538.

[8] The importance which the State attaches to the interest in maintaining residential privacy is reflected in the Illinois Legislature's finding accompanying the residential picketing statute:

"The Legislature finds and declares that men in a free society have the right to quiet enjoyment of their homes; that the stability of community and family life cannot be maintained unless the right to privacy and a sense of security and peace in the home are respected and encouraged; that residential picketing, however just the cause inspiring it, disrupts home, family and communal life; that residential picketing is inappropriate in our society, where the jealously guarded rights of free speech and assembly have always been associated with respect for the rights of others. For these reasons the Legislature finds and declares this Article to be necessary." Ill. Rev. Stat., ch. 38, § 21.1–1 (1977).

the most legitimate goal may not be advanced in a constitutionally impermissible manner. And though we might agree that certain state interests may be so compelling that where no adequate alternatives exist a content-based distinction—if narrowly drawn—would be a permissible way of furthering those objectives, cf. *Schenck* v. *United States,* 249 U. S. 47 (1919), this is not such a case.

First, the generalized classification which the statute draws suggests that Illinois itself has determined that residential privacy is not a transcendent objective: While broadly permitting all peaceful labor picketing notwithstanding the disturbances it would undoubtedly engender, the statute makes no attempt to distinguish among various sorts of nonlabor picketing on the basis of the harms they would inflict on the privacy interest. The apparent overinclusiveness and underinclusiveness of the statute's restriction would seem largely to undermine appellant's claim that the prohibition of all nonlabor picketing can be justified by reference to the State's interest in maintaining domestic tranquility.[9]

More fundamentally, the exclusion for labor picketing cannot be upheld as a means of protecting residential privacy for the simple reason that nothing in the content-based labor-nonlabor distinction has any bearing whatsoever on privacy. Appellant can point to nothing inherent in the nature of peaceful labor picketing that would make it any less disruptive of residential privacy than peaceful picketing on issues of broader social concern. Standing alone, then, the State's asserted interest in promoting the privacy of the home is not sufficient to save the statute.

---

[9] Cf. Kalven, The Concept of the Public Forum: Cox v. Louisiana, 1965 Sup. Ct. Rev. 1, 29 (quoted in *Young* v. *American Mini Theatres, Inc.,* 427 U. S. 50, 67, n. 27 (1976) (opinion of STEVENS, J.)): "If some groups are exempted from a prohibition on parades and pickets, the rationale for regulation is fatally impeached." See also *Police Department of Chicago* v. *Mosley,* 408 U. S., at 100; *Village of Schaumburg* v. *Citizens for a Better Environment,* 444 U. S. 620, 638–639 (1980).

## B

The second important objective advanced by appellant in support of the statute is the State's interest in providing special protection for labor protests. He maintains that federal [10] and state [11] law has long exhibited an unusual concern for such activities, and he contends that this solicitude may be furthered by a narrowly drawn exemption for labor picketing.

The central difficulty with this argument is that it forthrightly presupposes that labor picketing is more deserving of First Amendment protection than are public protests over other issues, particularly the important economic, social, and political subjects about which these appellees wish to demonstrate. We reject that proposition. Cf. T. Emerson, The System of Freedom of Expression 444–449 (1970) (suggesting that nonlabor picketing is more akin to pure expression than labor picketing and thus should be subject to fewer restrictions). Public-issue picketing, "an exercise of . . . basic constitutional rights in their most pristine and classic form,"

---

[10] See generally 29 U. S. C. § 141 *et seq.; Thornhill* v. *Alabama,* 310 U. S. 88 (1940); *AFL* v. *Swing,* 312 U. S. 321 (1941). Appellant does not go so far as to suggest that the National Labor Relations Act preempts the State from enacting a law prohibiting the picketing of residences involved in labor disputes. Such an argument has dubious merit. See *Machinists* v. *Wisconsin Employment Relations Comm'n,* 427 U. S. 132, 136, and n. 2 (1976).

[11] See Ill. Rev. Stat., ch. 48, § 2a (1977), which provides:

"No restraining order or injunction shall be granted by any court of this State . . . in any case involving or growing out of a dispute concerning terms or conditions of employment, enjoining or restraining any person or persons, either singly or in concert, . . . from peaceably and without threats or intimidation being upon any public street, or thoroughfare or highway for the purpose of obtaining or communicating information, or to peaceably and without threats or intimidation persuade any person or persons to work or to abstain from working, or to employ or to peaceably and without threats or intimidation cease to employ any party to a labor dispute, or to recommend, advise, or persuade others so to do."

*Edwards* v. *South Carolina,* 372 U. S. 229, 235 (1963), has always rested on the highest rung of the hierarchy of First Amendment values: "The maintenance of the opportunity for free political discussion to the end that government may be responsive to the will of the people and that changes may be obtained by lawful means, an opportunity essential to the security of the Republic, is a fundamental principle of our constitutional system." *Stromberg* v. *California,* 283 U. S. 359, 369 (1931). See generally A. Meiklejohn, Free Speech and Its Relation to Self-Government (1948). While the State's motivation in protecting the First Amendment rights of employees involved in labor disputes is commendable, that factor, without more, cannot justify the labor picketing exemption.

## C

Appellant's final contention is that the statute can be justified by some combination of the preceding objectives. This argument is fashioned on two different levels. In its elemental formulation, it posits simply that a distinction between labor and nonlabor picketing is uniquely suited to furthering the legislative judgment that residential privacy should be preserved to the greatest extent possible without also compromising the special protection owing to labor picketing. In short, the statute is viewed as a reasonable attempt to accommodate the competing rights of the homeowner to enjoy his privacy and the employee to demonstrate over labor disputes.[12]

---

[12] We note that the statute's labor dispute exemption is overbroad in this respect, for it not only protects the rights of the employee to picket the residence of his employer, but it also permits third parties to picket both the employer and his employee, even when there is no dispute between those individuals. As appellant's counsel explained at oral argument: "[T]he labor dispute could exist even if the employee wasn't part of the dispute. For example, if you have a condominium that employs non-union janitors and the non-union janitor is perfectly happy to be there, conceivably union janitors could engage in picketing, very much like a traditional labor law case." Tr. of Oral Arg. 14.

But this attempt to justify the statute hinges on the validity of both of these goals, and we have already concluded that the latter—the desire to favor one form of speech over all others—is illegitimate.

The second and more complex formulation of appellant's position characterizes the statute as a carefully drafted attempt to prohibit that picketing which would impinge on residential privacy while permitting that picketing which would not. In essence, appellant asserts that the exception for labor picketing does not contravene the State's interest in preserving residential tranquility because of the unique character of a residence that is a "place of employment." By "inviting" a worker into his home and converting that dwelling into a place of employment, the argument goes, the resident has diluted his entitlement to total privacy. In other words, he has "waived" his right to be free from picketing with respect to disputes arising out of the employment relationship, thereby justifying the statute's narrow labor exception at those locations.[13]

---

[13] An alternative justification for the statute—one not pressed by appellant—is that it is intended to protect privacy in the home, but only insofar as that objective can be accomplished without prohibiting those forms of speech that are peculiarly appropriate to residential neighborhoods *and cannot effectively be exercised elsewhere.* Since labor picketing arising out of disputes occurring in residential neighborhoods can only be carried out in those neighborhoods, the argument would continue, it is permitted under the statute while other forms of picketing, for which suitable alternative forums will generally exist, are barred.

Even assuming that a content-based distinction might in some cases be permissible on these grounds, but see *Schneider* v. *State,* 308 U. S. 147, 163 (1939) ("one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place"), this is not such a case because the Illinois statute is seriously underinclusive in this respect. It singles out for special protection only one of the many sorts of picketing which must be carried out in residential neighborhoods or not at all. Protests arising out of landlord-tenant relationships, zoning disputes, and historic preservation issues are just some

The flaw in this argument is that it proves too little. Numerous types of peaceful picketing other than labor picketing would have but a negligible impact on privacy interests,[14] and numerous other actions of a homeowner might constitute "nonresidential" uses of his property and would thus serve to vitiate the right to residential privacy. For example, the resident who prominently decorates his windows and front yard with posters promoting the qualifications of one candidate for political office might be said to "invite" a counter-demonstration from supporters of an opposing candidate. Similarly, a county chairman who uses his home to meet with his district captains and to discuss some controversial issue might well expect that those who are deeply concerned about the decision the chairman will ultimately reach would want to make their views known by demonstrating outside his home during the meeting. And, with particular regard to the facts of the instant case, it borders on the frivolous to suggest that a resident who invites a repairman into his home to fix his television set has "waived" his right to privacy with respect to a dispute between the repairman and the local union,[15] but that the official who has voluntarily chosen to enter the public arena has not likewise "waived" his right to privacy with respect to a challenge to his views on significant issues of social and economic policy.[16]

---

of the many demonstrations that bear a direct relation to residential neighborhoods. See generally Comment, Picketers at the Doorstep, 9 Harv. Civ. Rights—Civ. Lib. L. Rev. 95, 101–102, 106 (1974). Indeed, appellees themselves assert that they want to engage in residential picketing because it is the only effective means they have of communicating their concern about the issue of busing to the desired neighborhood audience. Yet the Illinois statute bars all of these groups from picketing in residential areas while those wishing to picket at the site of a labor dispute are permitted to do so.

[14] See supra, at 461–462.

[15] See n. 12, supra.

[16] Cf. Gertz v. Robert Welch, Inc., 418 U. S. 323 (1974).

## IV

We therefore conclude that appellant has not successfully distinguished *Mosley*. We are not to be understood to imply, however, that residential picketing is beyond the reach of uniform and nondiscriminatory regulation. For the right to communicate is not limitless. *E. g., Cox* v. *Louisiana,* 379 U. S. 536, 554–555 (1965); *Cox* v. *Louisiana,* 379 U. S. 559, 563–564 (1965).[17] Even peaceful picketing may be prohibited when it interferes with the operation of vital governmental facilities, see, *e. g., ibid.* (picketing or parading prohibited near courthouses); *Adderley* v. *Florida,* 385 U. S. 39 (1966) (demonstrations prohibited on jailhouse grounds), or when it is directed toward an illegal purpose, see, *e. g., Teamsters* v. *Vogt, Inc.,* 354 U. S. 284 (1957) (prohibition of picketing directed toward achieving "union shop" in violation of state law).

Moreover, we have often declared that "[a] state or municipality may protect individual privacy by enacting reasonable time, place, and manner regulations applicable to all speech *irrespective of content." Erznoznik* v. *City of Jacksonville,* 422 U. S. 205, 209 (1975) (emphasis supplied). See, *e. g., Cox* v. *New Hampshire,* 312 U. S. 569 (1941); *Kovacs* v. *Cooper,* 336 U. S. 77 (1949); *Poulos* v. *New Hampshire,* 345 U. S. 395 (1953); *Cox* v. *Louisiana,* 379 U. S., at 554; *Grayned* v. *City of Rockford,* 408 U. S. 104 (1972). In sum, "no mandate in our Constitution leaves States and governmental units powerless to pass laws to protect the public from the kind of boisterous and threatening conduct that disturbs the tranquility of spots selected by the people either for homes,

---

[17] Mr. Justice Goldberg's opinion for the Court in the first *Cox* case stated: "The rights of free speech and assembly, while fundamental in our democratic society, still do not mean that everyone with opinions or beliefs to express may address a group at any public place and at any time. The constitutional guarantee of liberty implies the existence of an organized society maintaining public order, without which liberty itself would be lost in the excesses of anarchy." 379 U. S., at 554.

wherein they can escape the hurly-burly of the outside business and political world, or for public and other buildings that require peace and quiet to carry out their functions, such as courts, libraries, schools, and hospitals." *Gregory* v. *Chicago,* 394 U. S. 111, 118 (1969) (Black, J., concurring).

Preserving the sanctity of the home, the one retreat to which men and women can repair to escape from the tribulations of their daily pursuits, is surely an important value. Our decisions reflect no lack of solicitude for the right of an individual "to be let alone" in the privacy of the home, "sometimes the last citadel of the tired, the weary, and the sick." *Id.,* at 125 (Black, J., concurring). See generally *Stanley* v. *Georgia,* 394 U. S. 557 (1969); *Rowan* v. *United States Post Office Dept.,* 397 U. S. 728 (1970); *FCC* v. *Pacifica Foundation,* 438 U. S. 726 (1978); *Payton* v. *New York,* 445 U. S. 573 (1980). The State's interest in protecting the well-being, tranquility, and privacy of the home is certainly of the highest order in a free and civilized society. " 'The crucial question, however, is whether [the Illinois' statute] advances that objective in a manner consistent with the command of the Equal Protection Clause.' *Reed* v. *Reed,* 404 U. S. [71], 76 [(1971)]." *Police Department of Chicago* v. *Mosley,* 408 U. S., at 99. And because the statute discriminates among pickets based on the subject matter of their expression, the answer must be "No."

The judgment of the Court of Appeals is       *Affirmed.*

Mr. Justice Stewart, concurring.

The opinion of the Court in this case, as did the Court's opinion in *Police Department of Chicago* v. *Mosley,* 408 U. S. 92, invokes the Equal Protection Clause of the Fourteenth Amendment as the basis of decision. But what was actually at stake in *Mosley,* and is at stake here, is the basic meaning of the constitutional protection of free speech:

"[W]hile a municipality may constitutionally impose reasonable time, place, and manner regulations on the

use of its streets and sidewalks for First Amendment purposes, and may even forbid altogether such use of some of its facilities; what a municipality may *not* do under the First and Fourteenth Amendments is to discriminate in the regulation of expression on the basis of the content of that expression." *Hudgens* v. *NLRB*, 424 U. S. 507, 520. (Citations omitted.)

It is upon this understanding that I join the opinion and judgment of the Court.

MR. JUSTICE REHNQUIST, with whom THE CHIEF JUSTICE and MR. JUSTICE BLACKMUN join, dissenting.

I address the merits of the Court's constitutional decision first, although I also seriously question the appellees' standing to assert the grounds for invalidity on which the Court apparently relies.[1] One who reads the opinion of the Court is probably left with the impression that Illinois has enacted a residential picketing statute which reads: "All residential picketing, except for labor picketing, is prohibited." Such an

---

[1] The Court premises its finding that the appellees have standing to challenge the statute at least in part on the basis of the appellant's "concessions" at oral argument that the State was not persisting in its challenge to appellees' standing in this Court. See *ante,* at 461, n. 5. But we have said that "[w]e are loath to attach conclusive weight to the relatively spontaneous responses of counsel to equally spontaneous questioning from the Court during oral argument." *Moose Lodge No. 107* v. *Irvis,* 407 U. S. 163, 170 (1972). Moreover, while appellant may have chosen not to challenge appellees' standing to argue that they had been denied equal protection under the statute, appellant certainly did not concede that appellees had standing to argue that other individuals desiring to picket under circumstances dissimilar to appellees might be denied equal protection under the statute. In fact, counsel quite explicitly stated that the Court should only consider the constitutionality of prohibiting the appellees' conduct: "I would urge that the . . . First Amendment question only be as applied to the plaintiffs, to the conduct that the plaintiffs actually engaged in. . . ." Tr. of Oral Arg. 17. And this is the standing question that is implicated by the Court's opinion. See *infra,* at 486–489.

impression is entirely understandable; indeed, it is created by the Court's own phrasing throughout the opinion. The Court asserts that Illinois, "in exempting from its general prohibition *only* the 'peaceful picketing of a place of employment involved in a labor dispute,' . . . discriminates between lawful and unlawful conduct based upon . . . content. . . ." (Emphasis added.) *Ante,* at 460. It states that "information about labor disputes may be freely disseminated, but discussion of all other issues is restricted." *Ante,* at 461. The Court finds that the permissibility of residential picketing in Illinois is dependent *"solely* on the nature of the message being conveyed." *Ibid.* (Emphasis added.) And again the Court states that "Illinois has flatly prohibited all nonlabor picketing" while the statute is said to "broadly permi[t] all peaceful labor picketing." *Ante,* at 462, 465.

Dissenting opinions are more likely than not to quarrel with the Court's exposition of the law, but my initial quarrel is with the accuracy of the Court's paraphrasing and selective quotation from the Illinois statute. The complete language of the statute, set out accurately in the text of the Court's opinion, reveals a legislative scheme quite different from that described by the Court in its narrative paraphrasing of the enactment.[2]

The statute provides that residential picketing is prohibited, but goes on to exempt four categories of residences from this general ban. *First,* if the residence is used as a "place

---

[2] The simplistic construction of the statute reflected in the Court's opinion apparently is also justified by supposed "concessions" of appellant's counsel at oral argument. *Ante,* at 461, n. 5. Appellant, however, has never suggested that the statute regulates picketing solely by permitting labor, but not nonlabor, issues to be aired through residential picketing. While admitting the use of some content differentiation, the appellant asserts throughout his argument that the statute is a "place" regulation; it allows picketing at homes used for nonresidential purposes but not at those homes used exclusively for residential purposes. See, *e.'g.,* the question presented for review in the Juris. Statement 4.

of business" *all* peaceful picketing is allowed. *Second,* if the residence is being used to "hol[d] a meeting or assembly on premises commonly used to discuss subjects of general public interest" *all* peaceful picketing is allowed. *Third,* if the residence is also used as a "place of employment" which is involved in a labor dispute, labor-related picketing is allowed. *Finally,* the statute provides that a resident is entitled to picket his own home. Thus it is clear that information about labor disputes may *not* be "freely disseminated" since labor picketing is restricted to a narrow category of residences. And Illinois has *not* "flatly prohibited all nonlabor picketing" since it allows nonlabor picketing at residences used as a place of business, residences used as public meeting places, and at an individual's own residence.

Only through this mischaracterization of the Illinois statute may the Court attempt to fit this case into the *Mosley* rule prohibiting regulation on the basis of *"content alone."* (Emphasis added.) *Police Department of Chicago* v. *Mosley,* 408 U. S. 92, 96 (1972). For in *Mosley,* the sole determinant of an individual's right to picket near a school was the content of the speech. As the Court today aptly observes, such a regulation warrants exacting scrutiny. In contrast, the principal determinant of a person's right to picket a residence in Illinois is not content, as the Court suggests, but rather the character of the residence sought to be picketed. Content is relevant only in one of the categories established by the legislature.

The cases appropriate to the analysis therefore are those establishing the limits on a State's authority to impose time, place, and manner restrictions on speech activities. Under this rubric, even taking into account the limited content distinction made by the statute, Illinois has readily satisfied its constitutional obligation to draft statutes in conformity with First Amendment and equal protection principles. In fact, the very statute which the Court today cavalierly invalidates has been hailed by commentators as "an excellent model" of

legislation achieving a delicate balance among rights to privacy, free expression, and equal protection. See Kamin, Residential Picketing and the First Amendment, 61 Nw. U. L. Rev. 177, 207 (1966); Comment, 34 U. Chi. L. Rev. 106, 139 (1966). The state legislators of the Nation will undoubtedly greet today's decision with nothing less than exasperation and befuddlement. Time after time, the States have been assured that they may properly promote residential privacy even though free expression must be reduced. To be sure, our decisions have adopted a virtual laundry list of "Don'ts" that must be adhered to in the process. Heading up that list of course is the rule that legislatures must curtail free expression through the "least restrictive means" consistent with the accomplishment of their purpose, and they must avoid standards which are either vague or capable of discretionary application. But somewhere, the Court says in these cases (with a reassuring pat on the head to the legislatures), there *is* the constitutional pot of gold at the end of the rainbow of litigation.

Here, where Illinois has drafted such a statute, avoiding an outright ban on all residential picketing, avoiding reliance on any vague or discretionary standards, and permitting categories of permissible picketing activity at residences where the State has determined the resident's own actions have substantially reduced his interest in privacy, the Court in response confronts the State with the "Catch–22" that the less restrictive categories are constitutionally infirm under principles of equal protection. Under the Court's approach today, the State would fare better by adopting *more* restrictive means, a judicial incentive I had thought this Court would hesitate to afford. Either that, or uniform restrictions will be found invalid under the First Amendment and categorical exceptions found invalid under the Equal Protection Clause, with the result that speech and only speech will be entitled to protection. This can only mean that the hymns of praise in prior opinions celebrating carefully drawn statutes are no

more than sympathetic clucking, and in fact the State is damned if it does and damned if it doesn't.

Equally troublesome is the methodology by which these difficult questions of constitutional law have been reached. The Court today figuratively walked a country mile to find a potential unconstitutional application of this statute, and it is primarily on that potential which the total nullification of this statute rests. Just because it is a statute which is in issue does not relieve this Court of its duty to decide only the concrete controversy presented by the case. As discussed below, I think it quite clear that the statute does not prohibit the appellees in this action from engaging in conduct which must be protected under the First Amendment, the state interests would not be satisfied by a statute employing less restrictive means, the statute is not facially overbroad by prohibiting conduct which clearly must be permitted under the First Amendment, and the appellees have not themselves been denied equal protection because they do not seek to picket under circumstances which are indistinguishable from the circumstances where picketing is allowed. Only by speculating that there *might* be an individual or group that will be denied equal protection by the statute can the Court invalidate it. This is speculation this Court is not permitted to indulge in when nullifying the acts of a legislative branch.

## I

The Illinois statute in issue simply does not contravene the First Amendment.

### A

Repeatedly, this Court has upheld state authority to restrict the time, place, and manner of speech, if those regulations "protect a substantial governmental interest unrelated to the suppression of free expression" and are narrowly tailored, limiting the restrictions to those reasonably necessary to protect the substantial government interest. *Brown* v. *Glines,*

444 U. S. 348, 354 (1980); *Village of Schaumburg* v. *Citizens for a Better Environment,* 444 U. S. 620 (1980). This standard of measuring permissible state regulation, often echoed in this Court's opinions, is readily satisfied in this case.

The interest which the State here seeks to protect is residential privacy, as clearly demonstrated by the legislature's statement of purpose. *Ante,* at 464, n. 8. When a residence is used for exclusively residential purposes, the State recognizes no exception to the ban on picketing. As in this case, it has not been asserted that Mayor Bilandic's home fell into any category other than a residence used solely for residential purposes. The appellees nevertheless assert that their interest in publicizing their opinions on the issue of school integration outweigh the State's asserted interest in protecting residential privacy.

Our cases simply do not support such a construction of the First Amendment. In *Kovacs* v. *Cooper,* 336 U. S. 77, 81 (1949), the state interest in preventing interference with the "social activities in which [city residents] are engaged or the quiet that they would like to enjoy" warranted the prohibition of sound trucks on residential streets. In *Rowan* v. *United States Post Office Dept.,* 397 U. S. 728, 736 (1970), this Court held that "[t]he right of every person 'to be let alone' must be placed in the scales with the right of others to communicate." The Court recognized a "very basic right to be free from sights, sounds, and tangible matter we do not want" in the home. *Ibid.* These interests were sufficient to justify a resident's ability to absolutely preclude delivery of unwanted mail to his address. Similarly, in *FCC* v. *Pacifica Foundation,* 438 U. S 726, 748 (1978), the Court found that an offensive broadcast could be absolutely banned from the airwaves because it "confronts the citizen, not only in public, but also in the privacy of the home, where the individual's right to be left alone plainly outweighs the First Amendment rights of an intruder." Under these authorities, the ap-

pellees have no fundamental First Amendment right to picket in front of a residence.

## B

Nor can it be said that the state interest could be fully protected by a less restrictive statute. An absolute ban on picketing at residences used solely for residential purposes permissibly furthers the state interest in protecting residential privacy. The State could certainly conclude that the presence of even a solitary picket in front of a residence is an intolerable intrusion on residential privacy. The Court today suggests that some picketing activities would have but a "negligible impact on privacy interests," intimating that Illinois could satisfy its interests through more limited restrictions on picketing, such as regulating the hours and numbers of pickets. *Ante,* at 469. But I find nothing in the cases of this Court to suggest that a State may not permissibly conclude that even one individual camped in front of the home is unacceptable. It is the State, and not this Court, which legislates to prohibit evils which its citizens find unescapable, subject only to the limitations of the United States Constitution. Unlike sound trucks, it is not just the distraction of the noise which is in issue—it is the very presence of an unwelcome visitor at the home. As a Wisconsin court described in *Wauwatosa* v. *King,* 49 Wis. 2d 398, 411–412, 182 N. W. 2d 530, 537 (1971):

> "To those inside . . . the home becomes something less than a home when and while the picketing . . . continue[s]. . . . [The] tensions and pressures may be psychological, not physical, but they are not, for that reason, less inimical to family privacy and truly domestic tranquility."

Whether noisy or silent, alone or accompanied by others, whether on the streets or on the sidewalk, I think that there are few of us that would feel comfortable knowing that a

stranger lurks outside our home. The State's prohibition of this conduct is even easier to justify than regulations previously upheld by this Court limiting mailings and broadcasts into the home. In *Rowan,* as in *Pacifica,* the resident at least could have short-circuited the annoyance by throwing away the mail or turning off the radio. Even that alternative redress, however, was held not sufficient to preclude the legislative authorities from prohibiting the initial intrusion. Where, as here, the resident has no recourse of escape whatsoever, the State may quite justifiably conclude that the protection afforded by a statute such as this seems even more necessary.

## C

Thus the appellees cannot secure the invalidation of this statute by urging that they seek to engage in expression which must be protected by the First Amendment or by demonstrating that a statute less restrictive of picketing would satisfy the state interest. On occasion this Court has, of course, permitted invalidation of a statute even though the plaintiff's conduct was not protected if the statute clearly "sweeps within its prohibitions what may not be punished under the First . . . Amendmen[t]." *Grayned* v. *City of Rockford,* 408 U. S. 104, 114–115 (1972).

But this statute satisfies even the overbreadth challenge. It is arguable that when a resident has voluntarily used his home for nonresidential uses in a way which reduces the resident's privacy interest, and the person seeking to picket the home has no alternative forum for effectively airing the grievance because it relates to this nonresidential use of the home, some form of residential picketing might be protected under the First Amendment. The courts which have found general prohibitions on residential picketing to be permissible under the First Amendment have considered the question more difficult under such circumstances. For example, in *Walinsky* v. *Kennedy,* 94 Misc. 2d 121, 404 N. Y. S. 2d 491 (1977), the

New York court enjoined all residential picketing but concluded that

> "[a] more difficult question would be raised if the [resident's] office were in his home and there was thus no other suitable forum wherein he could be confronted or the picket's viewpoints could be heard." *Id.,* at 132, n. 15, 404 N. Y. S. 2d, at 498, n. 15.

Similarly, in *Hibbs* v. *Neighborhood Organization to Rejuvenate Tenant Housing,* 433 Pa. 578, 580, 252 A. 2d 622, 623–624 (1969), the court found that a slumlord could be picketed at his home, but only because he effectively operated his business out of his residence and no other alternative situs was available to air the dispute. This Court has intimated a similar concern in dicta in *Senn* v. *Tile Layers,* 301 U. S. 468 (1937). There the right of laborers under a state statute to picket the residence of an employer who operated his business in his home was upheld, and the Court went on to say that "[m]embers of a union might, without special statutory authorization by a state, make known the facts of a labor dispute, for freedom of speech is guaranteed by the Federal Constitution." *Id.,* at 478.

I would by no means say without more that the State would have to permit such residential picketing, but such circumstances would, as the courts have found, present the greatest potential for a complaint of overbreadth. The State in the present case has forestalled any such challenge, however, by exempting such groups from the ban on residential picketing. Whether *required* by the Constitution or not, such exemptions are the concern of this Court only if they *violate* the Constitution. This Court in fact upheld enforcement of a statute permitting similar residential picketing in *Senn* v. *Tile Layers, supra.* Since the State has a legitimate interest in protecting speech activity and in particular, providing a forum where no other is reasonably available, excluding residences used for nonresidential purposes from the general

prohibition on residential picketing is an entirely rational legislative policy, even if not mandated by the First Amendment. Thus no overbreadth challenge should succeed here.

## II

Even though the statute does not prohibit conduct which is protected, the statute must also survive the hurdle of the Equal Protection Clause of the Fourteenth Amendment. By choosing a less-restrictive-means approach and excluding pickets at residences used for nonresidential purposes from the general prohibition, the Court concludes the State has violated equal protection. I do not think this result can be sustained because the appellees have not been denied equal protection and that is the only question this Court may properly review.

## A

*Police Department of Chicago* v. *Mosley,* 408 U. S. 92 (1972), states a standard by which equal protection requirements in the First Amendment context must be measured. The Court in that case identified the "crucial question" as "whether there is an appropriate governmental interest suitably furthered by the differential treatment" of the appellees' picketing. *Id.,* at 95. The interest asserted by the city was the prevention of disruption in the schools. Thus the statute, to satisfy *Mosley,* should have prohibited all picketing which could reasonably be categorized as disruptive. Yet the ordinance permitted labor picketing while prohibiting picketing relating to race discrimination (and all other nonlabor topics), even though both forms of picketing were equally disruptive.

Thus the question is whether the State has a substantial interest in differentiating between the picketing which appellees seek to conduct and the picketing which is permitted under the statute. For equal protection does not require that "things which are different in fact . . . be treated in law

as though they were the same." *Tigner* v. *Texas,* 310 U. S. 141, 147 (1940). Appellees seek to picket a residence to voice their views on school integration. There has been no showing that the resident has used his home for nonresidential purposes, or that no other forum is available where appellees may publicize their dispute.[3] All pickets who fall within this category, no matter what the content of their expression may be, are prohibited from residential picketing. School integration, public housing, labor disputes, and the recognition of Red China are treated alike in this respect. The State has differentiated only when the residence has been used as a place of business, a place for public meetings, or a place of employment, or is occupied by the picket himself. In each of these categories, the State has determined that the resident has waived some measure of privacy through voluntary use of his home for these purposes.

Our cases clearly support a State's authority to design the permissibility of picketing in relation to the use to which a particular building is put. As stated in *Grayned* v. *City of Rockford,* 408 U. S., at 116: "The nature of a place, 'the pattern of its normal activities, dictate the kinds of regulations of time, place, and manner that are reasonable.' . . . The crucial question is whether the manner of expression is basically incompatible with the normal activity of a particular place at a particular time." The fact that all areas could be classified as school grounds, however, would not mean that all school grounds had to be subject to the same restrictions. As the Court in *Grayned* noted: "Different considerations, of course, apply in different circumstances. For example, re-

---

[3] If it is the Mayor the appellees seek to reach, they have not shown they cannot do so at city hall. If it is the neighborhoods they seek to reach, they have not shown that they cannot do so in neighborhood parks. I think it is now clear that when speech interests are countered by other substantial governmental interests, the availability of another forum is a highly relevant factor in determining the appropriate balance. See *Pell* v. *Procunier,* 417 U. S. 817, 823–824 (1974).

strictions appropriate to a single-building high school during class hours would be inappropriate in many open areas on a college campus. . . ." *Id.*, at 120, n. 45. And just as surely the State may differentiate between residences used exclusively for residential purposes and those which are not. It is far from nonsensical or arbitrary for a legislature to conclude that privacy interests are reduced when the residence is used for these other purposes. In another First Amendment case, *Paris Adult Theatre I* v. *Slaton,* 413 U. S. 49, 61 (1973), we stated: "From the beginning of civilized societies, legislators and judges have acted on various unprovable assumptions. Such assumptions underlie much lawful state regulation of commercial and business affairs."

Despite the state interest in treating residences which are used for nonresidential purposes differently from residences which are not, the Court finds that the categories are improper because there is an element of content regulation in the statutory scheme. While content is clearly not the principal focus of the statutory categories, since content is only relevant in the one subcategory of "places of employment," the content restriction is quite clearly related to a legitimate state purpose. When an individual hires an employee to perform services in his home, it would not seem reasonable to conclude that the resident had so greatly compromised his residential status so as to permit picketing on any subject. The State may quite properly decide that the balance is better struck by the rule embodied in this statute which recognizes a more limited waiver of privacy interests by allowing only picketing relating to any labor dispute involving the resident *as employer* which has arisen out of the resident's choice of using his residence as a place of employment.

Content regulation, when closely related to a permissible state purpose, is clearly permitted. Surely the Court would not prohibit a city from preventing an individual from interrupting an orderly city council discussion of public housing to orate on the vices or virtues of nuclear power. Yet this is

content regulation. More accurately, it is restriction of topics to those appropriate to the forum. In this case, the forum is a confined one—residences used as a place of employment—and clearly labor picketing in that forum is the relevant topic.

This differentiation is supported by *Cox* v. *Louisiana*, 379 U. S. 559 (1965). There the Court upheld a state prohibition on picketing in front of a government building which was used as a courthouse if the content of the picketing could be presumed to demonstrate an intent to influence the judiciary. In *Cox* then, because of the nature of the state interest invoked, both the content of the picketing as well as the use of the building were considered determinative. The Court noted that if a mayor had an office in the courthouse and individuals were picketing on a topic relevant to the mayor, rather than the judiciary, then the speech would be permissible. Thus use and content, or as MR. JUSTICE STEVENS stated for the plurality in *Young* v. *American Mini Theatres, Inc.,* 427 U. S. 50 (1976), "content and context" are important determinants. As in *Cox,* a State need not treat residences which are used for different purposes in the same fashion, and when reasonably related to the state purpose, distinctions in content are permissible. See also *FCC* v. *Pacifica Foundation,* 438 U. S. 726 (1978); *Erznoznik* v. *City of Jacksonville,* 422 U. S. 205 (1975); *Young* v. *American Mini Theatres, supra.*

The question, therefore, is not whether there is some differentiation on the basis of content, but whether the appellees' prohibited conduct can be said to share the same characteristics of the conduct which is permitted. The Court devotes less than one page to what purports to be an equal protection analysis of this determinative question. In fact, only one sentence relates to the differences between the litigants in this case and the permitted picketing:

"And, with particular regard to the facts of the instant case, it borders on the frivolous to suggest that a resi-

dent who invites a repairman into his home to fix his television set has 'waived' his right to privacy with respect to a dispute between the repairman and the local union, but that the official who has voluntarily chosen to enter the public arena has not likewise 'waived' his right to privacy with respect to a challenge to his views on significant issues of social and economic policy." *Ante,* at 469.

First, it is unclear whether the Illinois statute would be construed to permit the type of labor picketing described in the Court's example where the dispute is not between the employer and the employee.[4] Second, the fact that an official has chosen to enter the public arena has no bearing on the question of how he uses his residence—the only question of relevance to the Illinois Legislature. Further, just as the State had an interest in *Cox* in preventing picketing which might tend to improperly influence the judicial process, the State certainly has an equal interest in preventing residential picketing of their officials where the result might be influence through the harassment of the official's family. This is not the type of influence that a democratic society has traditionally held high as a part of the Bill of Rights. Finally, at least in the case of the repairman, the home in fact is the situs of the publicized dispute, while the Mayor's home is not. The appellees do not seek to picket the situs of the dispute; they do not seek to picket the home of an individual who has used his residence for nonresidential purposes relevant to that dispute; they have not established the unavailability of any alternative forum. These are the characteristics of residen-

---

[4] If given an opportunity, the Illinois courts might determine that many repairmen are not "employees" under the statute. Further, it is also possible that the state courts would limit the disputes covered by the exception to those between the resident and his employee. More importantly, these are questions with which this court should not be concerned until the state courts have had an opportunity to address them. See *infra,* at 488.

tial picketing which the State has allowed. The appellees have thereby failed to establish that they seek to picket under circumstances rationally indistinguishable from the circumstances under which the State has permitted picketing. They have therefore not been denied equal protection.

## B

The Court makes little effort to establish that the appellees seek to picket under circumstances which are indistinguishable from the picketing permitted under the statute. Instead, it places the fulcrum of its equal protection argument on the fact that there might well be other actions of a homeowner which would constitute a "nonresidential" use of his property, warranting additional statutory exceptions. While I am not persuaded that the Court has identified an example of another picket who should likewise be permitted to picket under the justification forwarded by the State,[5] the flaws in

---

[5] The Court identifies several examples of picketing which the State would allegedly have to allow in order to avoid a successful equal protection attack. The Court indicates that there is no ground for differentiating between the picketing which is permitted and picketing relating to landlord-tenant disputes, zoning disputes, and historic preservation issues. *Ante,* at 468–469, n. 13. The first of these examples seems particularly inappropriate since picketing in relation to landlord-tenant disputes would most likely be permissible under the statute just as written. The statute exempts picketing by an individual at his residence, so it would certainly appear that a tenant could picket in front of his own dwelling (which also happens to be the situs of the dispute). If the landlord operates his business out of his home, the tenants would also be able to picket there under the statute. Thus there is no reason to believe that the picketing opportunities of tenants have been substantially limited by the statutory classifications, and in fact would appear to be at least as broad as those afforded to employees with labor disputes. Zoning disputes and historic preservation issues are distinguishable in several respects. First, those issues have no relationship to the use of an individual's residence (other than their own, which of course they may picket) and the individual resident would not have waived any privacy interests.

the analysis are more fundamental. First, the fact that there may be someone other than the appellees who has a right to be treated similarly to those permitted to picket is irrelevant to the question of constitutional validity in this case. The Court apparently believes it has a license to import the more relaxed standing requirements of First Amendment over-breadth into equal protection challenges. This, however, is not and should not be the law. Precedent supports no such approach and the rationale underlying the expanded standing principles in the overbreadth context are inapposite in the equal protection realm.

As we stated in *Grayned,* standing to challenge an ordinance which has been constitutionally applied to the plaintiff is permitted because otherwise the statute, if allowed to stand until a later challenge, will "deter privileged activity." 408 U. S., at 114. In the equal protection context, however, we are not concerned that conduct which *must* be permitted under the First Amendment will be prohibited, but only that conduct which could be and is properly prohibited be permitted if indistinguishable from other permitted conduct. The impact on speech is therefore a minimal one, while the jurisprudential considerations for declining to consider alternative applications loom large.

In *Barrows* v. *Jackson,* 346 U. S. 249, 256 (1953), an equal protection case, the Court identified the ordinary rule that, "even though a party will suffer a direct substantial injury

---

Second, alternative forums would theoretically include residential parks as well as the office of the authorities responsible for the relevant decisions.

The Court's citation of lawn decorations as a waiver of residential privacy seems odd since that act does not involve the voluntary admission of strangers into the home for some nonresidential purposes—a characteristic shared by each of the other exceptions. *Ante,* at 469. The Court's citation of a political party meeting is also distinguishable since this example does not share the commercial attributes of the other exemptions—where "nonresidential use" seems most readily found. An alternative forum would also not seem difficult to obtain in those circumstances.

from application of a statute, he cannot challenge its constitutionality unless he can show that he is within the class whose constitutional rights are allegedly infringed." The Court justified the rule, stating:

> "One reason for this ruling is that the state court, when actually faced with the question, might narrowly construe the statute to obliterate the objectionable feature, or it might declare the unconstitutional provision separable. *New York ex rel. Hatch* v. *Reardon,* [204 U. S.], at 160–161. . . . It would indeed be undesirable for this Court to consider every conceivable - situation which might possibly arise in the application of complex and comprehensive legislation. Nor are we so ready to frustrate the expressed will of Congress or that of the state legislatures. Cf. *Southern Pacific Co.* v. *Gallagher,* 306 U. S. 167, 172." *Id.,* at 256–257.

More recently in *Craig* v. *Boren,* 429 U. S. 190, 193 (1976), we emphasized that standing is "designed to minimize unwarranted intervention into controversies where the applicable constitutional questions are ill-defined and speculative." Sound principles of standing simply do not permit this Court to entertain any claim by the appellees in this action that someone other than themselves *might* be denied equal protection by the operation of the statute. See also *Young* v. *American Mini Theatres, Inc.,* 427 U. S., at 58–59, 60; *Broadrick* v. *Oklahoma,* 413 U. S. 601 (1973). This consideration is particularly compelling in this case since the appellees had an opportunity to seek a limiting construction of the statute by the Illinois courts when originally prosecuted for their picketing, but chose to plead guilty instead, thereby denying the one court system that could authoritatively limit the statute the opportunity to do so.

Even if this Court could properly take cognizance of the fact that some identifiable person not clearly encompassed in the statutory categories permitting picketing should also be

allowed to picket, under equal protection standards, that fact alone would not justify wholesale invalidation of the entire statutory framework. In *Califano* v. *Jobst,* 434 U. S. 47, 53–55 (1977), this Court emphasized that sound equal protection analysis must uphold general rules "even though such rules inevitably produce seemingly arbitrary consequences in some individual cases," and that "the broad legislative classification must be judged by reference to characteristics typical of the affected classes rather than by focusing on selected, atypical examples." Any other standard of review, such as that employed by the Court today, will inevitably lead to invalidation, for this or any other court will always be able to conceive of a hypothetical not properly accounted for by the statutory categories. The state courts, if given an opportunity, have the tools to correct such minor deficiencies. This Court has soundly permitted state legislatures far more room for error in the drafting of its categories than what the Court today allows. As it stated in *Ginsberg* v. *New York,* 390 U. S. 629, 642–643 (1968), "[w]e do not demand of legislatures 'scientifically certain criteria of legislation,' *Noble State Bank* v. *Haskell,* 219 U. S. 104, 110." And more recently, we recognized a compelling need to allow to local government "a reasonable opportunity to experiment with solutions to admittedly serious problems." *Young* v. *American Mini Theatres, supra,* at 71.

I can conclude this dissent with no more apt words than those of Mr. Justice Frankfurter in his concurring opinion in *Kovacs* v. *Cooper,* 336 U. S., at 97: "[I]t is not for us to supervise the limits the legislature may impose in safeguarding the steadily narrowing opportunities for serenity and reflection."